[No. F037618. Fifth Dist. July 11, 2003.]

M. W., a Minor, etc., Plaintiff and Respondent, v.
PANAMA BUENA VISTA UNION SCHOOL DISTRICT, Defendant and
Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[*]]**

---

[*]Parts II, III, and IV of the lead opinion are not certified for publication. (See Cal. Rules of Court, rules 976(b) and 976.1.)

510

COUNSEL

Sylvester & Oppenheim, Richard D. Oppenheim, Jr., Danalynn Pritz; Lewis, D'Amato, Brisbois & Bisgaard, R. Gaylord Smith, Jeffry A. Miller; Robinson, Palmer & Logan and Gary Logan for Defendant and Appellant.

Law Offices of Ralph B. Wegis and Ralph B. Wegis for Plaintiff and Respondent.

OPINION

WISEMAN, J.—We are called to address the accountability of school districts for actions that occur on their campuses when school grounds are open to students during noninstructional times. In this case, an eighth grade special education student filed suit against a school district after he was sodomized by another student in the school bathroom prior to the beginning of class. The school district provided only general supervision at the time, under which no adult was specifically responsible for supervision of the students on campus. A jury returned a verdict against the school district in excess of $2 million.

The school district appeals, arguing that it owed no duty of care to the student to prevent the sexual assault. We disagree. The assault occurred on the school's watch, while the student was entrusted to the school's care. It was substantially caused by the school's indifference toward the dangers posed by failing to adequately supervise its students, particularly special education students. In the published portion of this opinion, we find the school district owed the student a duty of care to protect him from this foreseeable assault.

In the unpublished portion of this opinion, we determine the district was not immune from liability and sufficient evidence supports the jury's findings of liability and damages. We affirm the judgment.

## PROCEDURAL AND FACTUAL HISTORIES

Earl Warren Junior High School is a 20-acre campus in defendant and appellant Panama Buena Vista Union School District (District) in Bakersfield, California, with seventh and eighth grade students. During the 1996–1997 school year, the gates to the school were unlocked at approximately 7:00 a.m. when custodial and cafeteria staff arrived. Custodial staff unlocked the bathrooms sometime between 7:00 a.m. and 7:45 a.m. The school principal typically arrived at 7:15 a.m. and the vice-principal between 7:20 a.m. and

7:30 a.m. Office staff arrived between 7:00 a.m. and 7:30 a.m. The teachers were required to be on duty to supervise at 7:45 a.m., and they arrived at varying times before the start of their shifts. School started at 8:15 a.m. Prior to 8:15 a.m., student access to the campus was unrestricted.

During the 1996–1997 school year, there were 560 students enrolled at the school. The majority of the students arrived on campus between 7:45 a.m. and 8:05 a.m. According to the principal, at 7:15 a.m., there were no more than five or 10 students on campus and sometimes no students at all. The school offered zero-period physical education at 7:30 a.m. for approximately 90 students. Those students typically arrived between 7:15 a.m. and 7:30 a.m. The principal testified that the early morning hours were historically calm and quiet. Prior to May 21, 1997, there were no reported problems in the morning before the start of school.

Each of the four junior high schools in the District had organized, directed supervision 30 minutes before the start of school. Prior to that time, each of the schools employed a different type of supervision. The decision regarding the type of supervision was left to the discretion of each school's principal. Two of the junior high schools required students who arrived early to congregate in a common area supervised by an adult.

At Earl Warren, the school had a policy of providing "general" supervision prior to 7:45 a.m., where every adult on campus was charged with the broad responsibility of supervising the students. On this critical point, the principal was impeached with his prior testimony. In his deposition, he testified that between 7:00 a.m. and 7:45 a.m. no one had the responsibility for supervision of the students. He later changed his answer to add "as relates to scheduled teacher supervision only." In any event, no adult had the responsibility to supervise students in a specific area. No one maintained visual contact over the students who arrived early, and there was no one supervising the bathrooms and handball courts, identified as "trouble spots" due to lack of visibility.

By contrast, "direct" or "scheduled" supervision began at 7:45 a.m., under which an assigned person supervised each area of the campus. The campus was divided into zones that specific individuals were responsible for supervising. The parents were never informed that there was no specific plan for supervision of the students prior to 7:45 a.m. Nor were they ever asked not to bring their children to school prior to 7:45 a.m.

In May 1997, plaintiff and respondent M.W. (the minor), 15 years old at the time, was enrolled in eighth grade at Earl Warren in a special education class. He had a third-grade mentality, and the school categorized him as

mentally retarded, a designation that carried special concerns with regard to his safety and well-being. The minor had unique vulnerabilities and was susceptible to being "tricked" and emotionally abused. The principal testified that sexual abuse of special education students was also a concern. The minor attracted attention because he frequently stood by himself. He struggled socially among his peers and complained to school personnel about being teased.

The minor's mother, a teacher with the District, routinely dropped the minor off at school between 7:15 a.m. and 7:20 a.m. on her way to work. The minor's mother testified that there were numerous parents transporting their children for the zero-period class and a lot of students walking about the campus. She dropped her son off in front of the school office. Between March and May 1997, the minor was sometimes reluctant to get out of the car. The minor's mother did not request school personnel to watch out for her son in the morning or to restrict his access to the campus. She never received any notice from the school requesting that she not bring her son early or advising that there was no supervision prior to 7:45 a.m. The minor's mother believed her son was supervised prior to the start of school.

The minor generally stayed near the school office and would often go inside and talk to the staff. Most of the other students who arrived early stayed inside an amphitheater area near the office. Sometimes the minor played at the basketball court by the gym. The minor was self-sufficient, well-behaved, and could use the restroom without adult assistance. Both the principal and vice-principal were aware that the minor was dropped off at school at 7:15 a.m.

Chris J. was a special education student at Earl Warren with the minor. He turned 14 years old in May 1997. Chris had educational difficulties and was in a resource specialist program. Chris had demonstrated misconduct with multiple individuals, including students, teachers and adults, and was frequently disciplined at school.

During his seventh and eighth grade years at Earl Warren, Chris received over 30 instances of discipline. His discipline record included 14 acts of defiance of authority; nine bus tickets for violating bus rules, culminating in suspension from the bus for the remainder of the school year; and six gum-chewing incidents. Chris was disciplined for disrupting class, damaging school property, displaying an inappropriate attitude, throwing food at the principal, and calling the yard supervisor a "bitch." Chris's misconduct was not limited to adults. He was also disciplined for spitting food at a student; kicking a male student in the groin; fighting (horseplay) with a student at the bus stop; "flipping off" a student; and punching and teasing the minor. As a

result of his conduct, Chris received numerous suspensions from school. The vice principal testified that Chris's response to the discipline was improving in his eighth grade year. Nonetheless, some of the more serious incidents— kicking a male student in the groin, calling the yard supervisor a "bitch," throwing food at the principal, and continuing acts of defiance—occurred in Chris's eighth grade year.

In November 1996, Chris's bus privileges were suspended in his eighth grade year. Afterward, Chris's father dropped him off at 6:20 a.m. or 6:30 a.m. before the school gates opened. School personnel did not have a specific recollection of seeing Chris on campus in the early morning hours. However, the principal testified that if Chris were dropped off at the school that early, he would have expected school personnel to have noticed him.

Chris and other students emotionally tormented the minor on a daily basis by teasing and ridiculing him before school started. They called the minor "stupid" and "retarded" in an effort to take advantage of him. According to Chris, the students did so because they were bored and "like[d] to get kicks out of other people's weaknesses." The minor sometimes retreated to the principal's office to escape the teasing. He complained several times to the vice-principal and his teachers about the teasing, but was only told to stay away from Chris. According to the minor, on one occasion in the seventh grade, Chris was sent to the principal's office after the minor complained, but Chris did not get in much trouble. The minor testified that, while in the eighth grade, he complained to the vice principal three separate times about Chris, but was always given the same response—to stay away from Chris—even after explaining that staying away did not work.

On May 21, 1997, just days before the end of the school year, Chris was "uptight" and "felt like he wanted to have sex that morning." Chris had been thinking about sex all morning when he witnessed the minor being dropped off at school by his mother. Chris remembered being able to lure the minor into an unlocked and unsupervised classroom in March 1997, where he grabbed the minor by the arms and rubbed his penis against the minor's penis. The minor did not tell anyone about that incident, which lasted about 10 minutes, because he was scared.

At approximately 7:15 a.m., with no adults in sight, Chris tricked the minor into entering the boy's restroom and then sodomized him. The two were in the restroom approximately 10 minutes. Chris threatened the minor by saying that if he told anyone, he (Chris) would kill him by punching his nose bone into his brain. Chris stated that he picked the minor "because he believed [the minor's] mental capacity to be that of a third or fourth grader and did not believe [the minor] could remember the things he had done to him, and

therefore, he would not tell anybody, anyone, and also, the threats he made towards [the minor] due to his mentality would scare him enough that he would not ever tell anyone."

Later that day, the minor told his mother about the assault in the bathroom, and she notified the District and the police. The following day, the minor spoke to the vice-principal about the assault. During the investigation, the District and the minor's mother first found out about the March 1997 incident in the classroom. Chris was arrested and subsequently expelled from school.

The minor became quiet and withdrawn. He constantly feared that Chris was going to kill him and obsessed about his own safety. He took excessively long baths, picked at his body and wiped his bottom until it bled. His seizures increased, and he reported hearing voices. The minor was diagnosed with major depression recurrent with psychotic features. He was also diagnosed with post-traumatic stress disorder. The minor was twice hospitalized, including following a suicide attempt after students locked him in a "porta potty" in April 1999.

On March 11, 1998, the minor filed a complaint for personal injuries and damages against the District, Chris and Chris's parents. The minor's amended complaint alleged one cause of action against the District for negligent failure to supervise and careless failure to guard, maintain, inspect and manage the school premises. The District moved for summary judgment, alleging it did not owe a duty of care to supervise the minor or Chris more closely than it did, since it was unaware that the minor was at risk of a physical or sexual assault by Chris. The District also maintained that the alleged failure to adequately supervise did not render the school restroom a dangerous condition of public property. The trial court denied the motion, finding that the District failed to prove it had a complete defense or that its duty could not be established by the minor.

In August 1999, the case resulted in a mistrial.[1] In January 2000, the minor was admitted to an independent living school and residential facility where he showed improvement. In July 2000, the District filed a renewed motion for summary judgment based on new decisional law and testimony from the first trial. The District argued that it owed no duty to the minor to protect him from an unforeseeable sexual assault and that any alleged lack of supervision was not a cause of plaintiff's injuries. The court denied the motion, finding a triable issue of fact regarding whether it was foreseeable that the minor's mental capacity exposed him to harm from third persons and whether the

---

[1] There are no court minutes or other documents in our record relating to the mistrial. However, the mistrial is referenced in the District's renewed motion for summary judgment.

District provided the kind of supervision that a reasonably prudent person would afford under the circumstances. The court found the causation issue to be a different one than was brought in the first motion and therefore not a proper subject of a renewed motion.

Following a 15-day trial in November and December 2000, the jury returned a verdict in favor of the minor in the amount of $2,547,260, which represented $1,547,260 for economic damages and $1,000,000 for non-economic damages. The jury attributed 85 percent of the fault to the District and 15 percent of the fault to Chris. Judgment was entered against the District in the amount of $2,165,171 (85 percent of $2,547,260). The court granted the minor's motion for a corrective nunc pro tunc order, and the judgment against the District was amended to $2,397,260 ($1,547,260 plus 85 percent of $1,000,000). The court denied the District's motions for a new trial and judgment notwithstanding the verdict.

## DISCUSSION

The District claims reversible error based on a number of independent grounds: 1) it owed the minor no duty of care to prevent the sexual assault; 2) even assuming it owed and breached its duty of care to the minor, the breach was not the actual cause of the minor's injuries; 3) it is immune from liability; and 4) there is insufficient evidence to support the jury's apportionment of fault and the minor's claim for future damages.

### I. *Duty of care*

The District maintains it owed the minor no duty to protect him from the sexual assault, since it had no prior actual knowledge of Chris's propensity to commit the assault. ■ The existence of a duty of care is a question of law decided on a case-by-case basis. (*Leger v. Stockton Unified School Dist.* (1988) 202 Cal.App.3d 1448, 1458 [249 Cal.Rptr. 688]; *Bartell v. Palos Verdes Peninsula Sch. Dist.* (1978) 83 Cal.App.3d 492, 498 [147 Cal.Rptr. 898].) " 'While it is the province of the jury, as trier of fact, to determine whether an unreasonable risk of harm was foreseeable under the particular facts of a given case, the ... court must still decide as a matter of law whether there was a duty in the first place, even if that determination includes a consideration of foreseeability. [Citations.]' [Citation.]" (*Romero v. Superior Court* (2001) 89 Cal.App.4th 1068, 1078 [107 Cal.Rptr.2d 801]; see also *Wiener v. Southcoast Childcare Centers, Inc.* (2003) 107 Cal.App.4th 1429, 1436■ [132 Cal.Rptr.2d 883] [issue of foreseeability, when analyzed to determine existence or scope of duty, is question of law].) Moreover, in light of the jury's verdict in this case, "[i]n reviewing the evidence on such an appeal all conflicts must be resolved in favor of the respondent, and all legitimate

and reasonable inferences indulged in to uphold the verdict if possible." (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) Thus, to the extent there are any factual conflicts underlying the legal question of duty, those factual conflicts must be resolved in favor of the minor.

" 'As a general rule, one owes no duty to control the conduct of another, nor to warn those endangered by such conduct. Such a duty may arise, however, if "(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives the other a right to protection." [Citations.]' [Citations.]" (*Leger v. Stockton Unified School Dist.*, *supra*, 202 Cal.App.3d at p. 1458.)

A special relationship is formed between a school district and its students resulting in the imposition of an affirmative duty on the school district to take all reasonable steps to protect its students. This affirmative duty arises, in part, based on the compulsory nature of education. (*Rodriguez v. Inglewood Unified School Dist.* (1986) 186 Cal.App.3d 707, 714–715 [230 Cal.Rptr. 823]; see also Cal. Const., art. I, § 28, subd. (c) [students have inalienable right to attend safe, secure and peaceful campuses]; Ed. Code, § 48200 [children between ages 6 and 18 years subject to compulsory full-time education].) "[T]he right of all students to a school environment fit for learning cannot be questioned. Attendance is mandatory and the aim of all schools is to teach. Teaching and learning cannot take place without the physical and mental well-being of the students. The school premises, in short, must be safe and welcoming." (*In re William G.* (1985) 40 Cal.3d 550, 563 [221 Cal.Rptr. 118, 709 P.2d 1287].)

The principles pertaining to a school district's duty to supervise students are well established. "It is the duty of the school authorities to supervise at all times the conduct of the children on the school grounds and to enforce those rules and regulations necessary to their protection. [Citations.] The school district is liable for injuries which result from a failure of its officers and employees to use ordinary care in this respect." (*Taylor v. Oakland Scavenger Co.* (1941) 17 Cal.2d 594, 600 [110 P.2d 1044]; see also *Dailey v. Los Angeles Unified Sch. Dist.* (1970) 2 Cal.3d 741, 747 [87 Cal.Rptr. 376, 470 P.2d 360]; Ed. Code, § 44807; Cal. Code Regs., tit. 5, § 5552 [where playground supervision is not otherwise provided, principal of school must provide for supervision by certificated employees of pupils on the school grounds during recess and other intermissions and before and after school].)

The purpose of the law requiring supervision of students on school property is to regulate students' conduct "so as to prevent disorderly and

dangerous practices which are likely to result in physical injury to immature scholars ...." (*Forgnone v. Salvador U. E. School Dist.* (1940) 41 Cal.App.2d 423, 426 [106 P.2d 932].) As noted by the California Supreme Court, "[s]uch regulation is necessary precisely because of the commonly known tendency of students to engage in aggressive and impulsive behavior which exposes them and their peers to the risk of serious physical harm." (*Dailey v. Los Angeles Unified Sch. Dist., supra,* 2 Cal.3d at p. 748.)

The California Supreme Court explained the standard of care imposed upon a school district in supervising its students as follows: "The standard of care imposed upon school personnel in carrying out [the] duty to supervise is identical to that required in the performance of their other duties. This uniform standard to which they are held is that degree of care 'which a person of ordinary prudence, charged with [comparable] duties, would exercise under the same circum[s]tances.' [Citations.] Either a total lack of supervision [citation] or ineffective supervision [citation] may constitute a lack of ordinary care on the part of those responsible for student supervision." (*Dailey v. Los Angeles Unified Sch. Dist., supra,* 2 Cal.3d at p. 747; see also *Leger v. Stockton Unified School Dist., supra,* 202 Cal.App.3d at p. 1459.)

■ California courts have long recognized that a student may recover for injuries proximately caused by a breach of this duty to supervise. (See, e.g., *Hoyem v. Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508, 523 [150 Cal.Rptr. 1, 585 P.2d 851] [student stated claim against school district based on failure to exercise due care in supervision on school premises]; *Dailey v. Los Angeles Unified Sch. Dist., supra,* 2 Cal.3d at pp. 747–751 [sufficient evidence to support verdict against school district for negligent supervision even where another student's misconduct was immediate, precipitating cause of injury]; *Lucas v. Fresno Unified School Dist.* (1993) 14 Cal.App.4th 866, 871–873 [18 Cal.Rptr.2d 79] [school district had legal duty to supervise students to prevent them from throwing dirt clods at each other during recess]; *Charonnat v. S.F. Unified Sch. Dist.* (1943) 56 Cal.App.2d 840, 845–846 [133 P.2d 643] [school district liable for negligence or willful misconduct of pupil resulting in injuries to another pupil while both were playing during recess hour]; *Forgnone v. Salvador U. E. School Dist., supra,* 41 Cal.App.2d at p. 426 [wrongful absence of supervisor may constitute negligence creating liability on part of school district for student's injuries].)

In this case, we decide whether the District owed a duty to protect the minor from a sexual assault by Chris. ■ The existence of a duty of care of a school district toward a student depends, in part, on whether the particular harm to the student is reasonably foreseeable. (*Leger v. Stockton*

*Unified School Dist., supra,* 202 Cal.App.3d at p. 1459.) Students are not at risk merely because they are at school, and schools, including school restrooms, are not dangerous places per se. (*Ibid.*) Foreseeability is determined in light of all the circumstances and does not require prior identical events or injuries. (*Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 502–503 [229 Cal.Rptr. 456, 723 P.2d 573]; *Ziegler v. Santa Cruz City High Sch. Dist.* (1959) 168 Cal.App.2d 277, 284 [335 P.2d 709].) "It is not necessary to prove that the very injury which occurred must have been foreseeable by the school authorities .... Their negligence is established if a reasonably prudent person would foresee that injuries of the same general type would be likely to happen in the absence of [adequate] safeguards." (*Taylor v. Oakland Scavenger Co., supra,* 17 Cal.2d at p. 600; see also *Leger v. Stockton Unified School Dist., supra,* 202 Cal.App.3d at p. 1460 [harm reasonably foreseeable from threats of violence known by school authorities even where violence had yet to occur].) Further, "the issue of 'foreseeability' does not depend upon the foreseeability of a particular third party's act, but instead focuses on whether the allegedly negligent conduct at issue created a foreseeable risk of a *particular kind of harm.*" (*Wiener v. Southcoast Childcare Centers, Inc., supra,* 107 Cal.App.4th at p. 1436.)

"The term 'duty' is a conclusory statement which reflects the sum total of policy considerations which leads the law to say a particular plaintiff is entitled to protection against a specific harm. [Citations.] Even though a harm may be foreseeable, ... a concomitant duty to forestall and prevent the harm does not automatically follow. [Citations.] Rather, the question is whether the risk of harm is sufficiently high and the amount of activity needed to protect against harm sufficiently low to bring the duty into existence, a threshold issue of law which requires the court to consider such additional factors as the burdensomeness of the duty on defendant, the closeness of the relationship between defendant's conduct and plaintiff's injury, the moral blame attached to defendant's conduct and plaintiff's injury, and the prevention of future harm." (*Bartell v. Palos Verdes Peninsula Sch. Dist., supra,* 83 Cal.App.3d at pp. 499–500; see also *Wiener v. Southcoast Childcare Centers, Inc., supra,* 107 Cal.App.4th at p. 1436.)

In this case, Earl Warren's gates were unlocked at approximately 7:00 a.m., 45 minutes before scheduled supervision. After 7:00 a.m., student access to the campus was unrestricted until the start of school at 8:15 a.m. The District was admittedly aware that students were on campus between 7:00 a.m. and 7:45 a.m. However, no adult was charged with the specific responsibility of supervising these students in areas on the campus. In short, no one watched these students or the "trouble spots," such as the school bathrooms, during this period. The District in no way advised parents not to bring their children prior to 7:45 a.m. Nor did the District inform the parents of the lack of direct

supervision in the early morning hours. In fact, the minor's mother believed her son was supervised prior to the start of school.

The District schooled special education students and was aware that at least one, the minor, arrived on campus at 7:15 a.m. The District acknowledged that, as a special education and mentally retarded student, the minor had unique vulnerabilities and was susceptible to abuse. The principal of Earl Warren, himself, testified that the sexual abuse of special education students was a concern. The minor complained several times about Chris, who received over 30 instances of discipline during his two years at Earl Warren. This discipline resulted from grave acts of defiance and inappropriate and violent behavior that included kicking a male student in the groin; throwing food at the principal; calling the yard supervisor a "bitch"; damaging school property; "flipping off" a student; and punching and teasing the minor. Chris received several suspensions from school. This was clearly a troubled child and the District knew it. In addition, even though school personnel did not have a specific recollection of seeing Chris on campus prior to 7:45 a.m., the District was aware that Chris's bus privileges had been suspended, and the principal expected employees to have noticed Chris, particularly given the low number of students on campus in the early morning.

In short, we find it reasonably foreseeable that, given the lack of direct supervision in the early morning hours, a special education student, such as the minor, was at risk for a sexual or other physical assault. The District's superintendent acknowledged that supervision has a special meaning to educators on the issue of safety and entails observing the person being supervised. This simply did not occur at Earl Warren prior to 7:45 a.m. Given the unique vulnerabilities of special education students, the District knew or reasonably should have known that the minor was subject to the risk of an assault, including a sexual assault, from Chris.

It is not necessary for the District to have foreseen that an act of sodomy could have occurred. We find no distinction between a physical assault and a sexual assault for purposes of foreseeability in this case. (See *Wiener v. Southcoast Childcare Centers, Inc.*, *supra*, 107 Cal.App.4th at pp. 1436–1437 [defendants' alleged negligent conduct in failing to erect sufficient barrier between childhood learning center playground and adjacent street sufficiently likely to result in kind of harm experienced—children being struck by automobile driven on playground—that liability appropriately imposed regardless of whether criminal act of driver was foreseeable]; see also *Claxton v. Atlantic Richfield Co.* (2003) 108 Cal.App.4th 327, 330, 338–339 [133 Cal.Rptr.2d 425] [prior incidents of criminal assaults at gas station that were not racially motivated were sufficiently similar to hate crime to give rise to duty to prevent attack]; cf. *Thompson v. Sacramento City Unified School*

*Dist.* (2003) 107 Cal.App.4th 1352, 1369–1370 [132 Cal.Rptr.2d 748] [no duty of care owed to student injured in fight at school where assailant had threatened to hit another student the day prior, since no foreseeable danger to readily identifiable potential victim].) ■ The fact that a particular act of sodomy in a school bathroom may have been unforeseeable does not automatically exonerate the District from the consequences of allowing students, particularly special education students, unrestricted access to the campus prior to the start of school with wholly inadequate supervision. Such conduct created a foreseeable risk of a particular type of harm—an assault on a special education student. Not only was such an assault reasonably foreseeable, it was virtually inevitable under the circumstances present on this campus.

■ When a school district instructs special education children, it takes on the unique responsibilities associated with this instruction and the special needs of these children. Further, the burden on school districts to provide adequate supervision for such students prior to the start of school is minimal. In fact, a school district could satisfy its responsibility merely by precluding students from coming on campus in the early morning hours. More over, there is no additional financial burden placed on school districts to prevent a sexual assault as compared to any other assault. The District's own practice proves our point. Within the District, two other junior high schools required students who arrived early to congregate in a common area supervised by an adult. Unlike here, students were not allowed to roam the campus without any supervision. We are not imposing an unusual or onerous duty upon the District to provide supervision prior to 7:45 a.m. Instead, we are only requiring supervision that other schools within the District have already seen fit to provide on their campuses. This is especially important, given the District's knowledge of the unique factual circumstances in this case.

■ Given the foreseeability of harm to special education students, the well-settled statutory duty of school districts to take all reasonable steps to protect them, the relatively minimal burden on school districts to ensure adequate supervision for any students they permit on their campuses prior to the start of school, and the paramount policy concern of providing our children with safe learning environments, we find the District owed the minor a duty of care to protect him from an assault on campus. (See *Thompson v. Sacramento City Unified School Dist., supra,* 107 Cal.App.4th at pp. 1364–1365 [articulating factors considered in determining whether duty was owed].)

The District relies on *Romero v. Superior Court, supra,* 89 Cal.App.4th 1068, and *Chaney v. Superior Court* (1995) 39 Cal.App.4th 152 [46 Cal.Rptr.2d 73] in maintaining it owed the minor no duty to protect him

from a sexual assault by Chris because it had no actual knowledge of Chris's propensity to commit a sexual assault. In *Chaney*, a 23-year-old woman alleged that a close personal family friend sexually assaulted her while she was in his home over many years, beginning when she was 10 years old. The woman filed suit against her alleged assailant and joined the assailant's wife on the theory that she caused the woman to suffer damages by negligently supervising her while she was in the home. (*Id.* at pp. 154–155.) In addressing the extent of a wife's duty to her minor invitees to prevent sexual assaults perpetrated by her husband, the court held: "[P]ublic policy requires that where a child is sexually assaulted in the defendant wife's home by her husband, the wife's duty of reasonable care to the injured child depends on whether her husband's behavior was reasonably foreseeable. Without knowledge of her husband's deviant propensities, a wife will not be able to foresee that he poses a danger and thus will not have a duty to take measures to prevent the assault." (*Id.* at p. 157.)

The *Chaney* rule was applied in *Romero*, where a 16-year-old boy assaulted a 13-year-old girl while the two were visiting a friend's home. The girl's mother had indicated her desire to the friend's parents that they supervise the teenagers, and the assault occurred when the parents left home for an hour. (*Romero v. Superior Court, supra*, 89 Cal.App.4th at pp. 1073–1075.)

"Prior to the incident, [the 16-year-old boy] had a long history of school misconduct, including sexual harassment of female students, fighting, and other misbehavior that resulted in numerous detentions and suspensions. He had been arrested and charged with vandalism and violating curfew. [One of the friend's parents] was aware of [the boy's] curfew violations, but there [was] no evidence the [parents] knew about the arrests and [the boy's] misconduct in school." (*Romero v. Superior Court, supra*, 89 Cal.App.4th at p. 1074.)

The parents thus had no knowledge of the boy's propensity "to inflict violence on female minors," and they did not know about the existence of his school disciplinary record. (*Romero v. Superior Court, supra,* 89 Cal.App.4th at p. 1087.) The girl and her mother sued the parents for negligent supervision and emotional distress. The trial court granted summary judgment as to the emotional distress claim, but found the parents owed a duty of care to the girl and allowed the negligent supervision claim to proceed. (*Id.* at pp. 1075–1076.)

In holding that summary judgment should have been granted on the negligent supervision claim, the appellate court reasoned:

"We believe ... that sound public policy requires that where one invitee minor sexually assaults another in the defendant's home, the question of whether the defendant owed a duty of reasonable care to the injured minor depends on whether the assailant minor's conduct was *reasonably foreseeable*, but that conduct will be deemed to have been reasonably foreseeable only if the defendant had *actual knowledge* of the assaultive propensities of the teenage assailant. [¶] ... [¶]

"We adopt and apply the *Chaney* duty rule and hold as a matter of law that an adult defendant who assumed a special relationship with a minor by inviting the minor into his or her home will be deemed to have owed a duty of care to take reasonable measures to protect the minor against an assault by another minor invitee while in the defendant's home when the evidence and surrounding circumstances establish that the defendant had *actual knowledge* of, and thus *must have known*, the offending minor's assaultive propensities. Under the California 'no duty to aid' rule ..., no liability may be imposed on such a defendant for negligent supervision of an injured minor invitee under a nonfeasance theory of liability solely upon evidence that the defendant had *constructive* knowledge or notice of, and thus 'should have known' about, the minor assailant's assaultive propensities.

"Were we to hold otherwise, parents who invite into their homes teenage minors they do not know intimately would face lawsuits and potentially devastating financial liability in tort in the event one invitee minor assaults another under circumstances in which the assaultive propensities of the offending teenager were not known to them. Parents possessing any information suggesting that a teenager that they or their own children may wish to invite into the home may have been involved in physical conduct that resulted, for example, in disciplinary action at school would be required to conduct an investigation in order to protect themselves against potential liability. They would be hampered in their investigative efforts by legitimate and well-established rules of confidentiality regarding juvenile matters." (*Romero v. Superior Court, supra,* 89 Cal.App.4th at pp. 1081, 1083.)

The court concluded that, in spite of the special relationship between the parents and the teenage invitees, the parents did not owe a duty of care to supervise the victim at all times during her visit, to warn her, or to protect her against the sexual assault. This was because there was no evidence the parents had prior actual knowledge of the assailant's propensity to sexually assault female minors. (*Romero v. Superior Court, supra,* 89 Cal.App.4th at p. 1080.) While the parents knew the 16-year-old boy before the incident, they never considered him dangerous and thought him polite, helpful and likeable. The parents knew nothing adverse about him other than that he might have had a curfew violation. (*Id.* at p. 1088.)

"The circumstantial evidence on which plaintiffs relied included (among other things) [the boy's] school records showing he had a long history of misconduct, including sexual harassment of female students, fighting and other misbehavior that resulted in numerous detentions and suspensions; as well as evidence that [the boy] had been arrested and charged with vandalism. *There is no evidence in the record to show that the [parents] knew about this misconduct.* We conclude the evidence presented by [the girl] was insufficient as a matter of law to show that the [parents] owed her a duty to supervise and protect her from a sexual assault by [the boy] during the short period of time the [parents] were away from home .... [The girl] cites no authority, and we are aware of none, that requires adults to assume that a male teenage invitee will sexually assault a female teenage invitee simply because the adults are away from the house for an hour." (*Romero v. Superior Court, supra,* 89 Cal.App.4th at p. 1088, italics added.)

Relying on *Chaney,* the *Romero* court noted that the plaintiffs must allege facts showing that sexual misconduct was foreseeable. (*Romero v. Superior Court, supra,* 89 Cal.App.4th at p. 1089.)

"To impose on an adult a duty to supervise and protect a female teenage invitee against sexual misconduct by a male teenage invitee, it is not enough to assert that [it] [is] *conceivable* the latter might engage in sexual misconduct during a brief absence of adult supervision. As we have already held, the imposition of such a duty of care requires evidence of facts from which a trier of fact could reasonably find that the defendant adult had prior actual knowledge of the teenage assailant's propensity to sexually molest other minors. [¶] Here, the record is devoid of any such evidence. [The girl] presented no evidence, direct or circumstantial, from which the trier of fact could reasonably conclude that the [parents] must have known of [the boy's] history of misconduct at school, his arrests, or his propensity to sexually assault a female minor." (*Romero v. Superior Court, supra,* 89 Cal.App.4th at p. 1089, fn. omitted.)

The District implores us to extend the *Romero/Chaney* rule to this case. We find no authority to support the District's position and decline to adopt it. The public policy reasons surrounding the *Romero/Chaney* rule do not exist in the context of a school district's supervisory responsibilities. Simply put, the school grounds provide a different setting than an adult's home. And there are differing public policy concerns related to the responsibilities of school districts that provide mandatory education as compared to adults who invite children into their home on a voluntary basis.

■ School districts are subject to well-established statutory duties mandating adequate supervision for the protection of the students. These affirmative duties arise from the compulsory nature of school attendance, the

expectation and reliance of parents and students on schools for safe buildings and grounds, and the importance to society of the learning activity that takes place in schools. (See *Rodriguez v. Inglewood Unified School Dist.*, *supra*, 186 Cal.App.3d at p. 714.) These duties are not charged to private homeowners who invite minors into their homes. We therefore conclude that the District owed the minor a duty of care to protect him from the sexual assault.

II.–IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed. Costs are awarded to respondent.

**HARRIS, Acting P. J.,** Concurring.—I concur fully in Justice Wiseman's opinion. I write separately to make further comments as to the existence of the school district's duty toward the minor victim in this case. First, I note that *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666 [25 Cal.Rptr.2d 137, 863 P.2d 207] and *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181 [91 Cal.Rptr.2d 35, 989 P.2d 121] address premises liability and are inapplicable to the instant case given the special relationship that exists between a school district and its students.

Second, in my view, even if *Romero v. Superior Court* (2001) 89 Cal.App.4th 1068 [107 Cal.Rptr.2d 801] was extended to this type of situation, the school district herein would still have a duty toward the minor victim given its actual knowledge of the pertinent factual circumstances in this case. *Romero* held the parents therein had no legal duty to the victim because they had no actual knowledge of the minor's assaultive tendencies or even his school disciplinary record, which included "a long history of misconduct, including sexual harassment of female students, fighting and other misbehavior that resulted in numerous detentions and suspensions; as well as evidence that [the minor] had been arrested and charged with vandalism." (*Id.* at p. 1088.) In contrast to *Romero*, however, the school district was well aware of Chris's disciplinary record and his assaultive propensities, his prior interactions with the victim, the victim's repeated complaints about him, and their presence together on campus in the absence of supervision, and it could be held liable for failing to provide that supervision.

---

*See footnote, *ante*, page 508.

**LEVY, J., Dissenting.**—The victim in this case suffered grievous harm. Moreover, Chris, the 14-year-old perpetrator, unquestionably had serious behavior problems. However, I cannot agree that it was *reasonably foreseeable* that a student, who had been disciplined primarily for defiant and disruptive behavior, would rape another student while on school grounds. The majority's contrary position expands the concept of duty to the point of essentially imposing strict liability on school districts for the criminal conduct of any student with a discipline record that includes hitting and kicking other students. This is a clear departure from established California law. Therefore, I respectfully dissent.

As noted by the majority, a school district has a general legal duty to exercise reasonable care in supervising the conduct of the students on school grounds and may be held liable for injuries proximately caused by the failure to exercise such care. (*Hoyem v. Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508, 513 [150 Cal.Rptr. 1, 585 P.2d 851].) The standard imposed on school personnel in carrying out this duty is the degree of care " 'which a person of ordinary prudence, charged with [comparable] duties, would exercise under the same circumstances.' " (*Dailey v. Los Angeles Unified Sch. Dist.* (1970) 2 Cal.3d 741, 747 [87 Cal.Rptr. 376, 470 P.2d 360].) For example, a school district may be held liable for injuries arising out of students engaging in unsupervised "roughhousing" or "horseplay" on campus during school hours, i.e., the type of behavior one would expect from unsupervised children. (*Dailey v. Los Angeles Unified Sch. Dist., supra,* 2 Cal.3d at p. 751.) Nevertheless, there are limits on this duty to supervise. A school district is not an insurer of its students' safety. (*Hoyem v. Manhattan Beach City Sch. Dist., supra,* 22 Cal.3d at p. 513.)

With respect to the district's alleged negligent supervision in the context of this particular incident, the district cannot be held liable for the minor's injuries in the absence of a legal duty to protect its students from sexual assaults perpetrated by other students while on campus. Such a duty exists only if the risk of the particular type of harm was reasonably foreseeable when it occurred. (*Dillon v. Legg* (1968) 68 Cal.2d 728, 739 [69 Cal.Rptr. 72, 441 P.2d 912].) "As a classic opinion states: 'The risk reasonably to be perceived defines the duty to be obeyed.' (*Palsgraf v. Long Island R.R. Co.* (1928) 248 N.Y. 339, 344 [162 N.E. 99] ....)" (*Ibid.*) Moreover, the bare *possibility* that the injury complained of could result from the defendant's acts is insufficient. Through hindsight, everything is foreseeable. (*Hegyes v. Unjian Enterprises, Inc.* (1991) 234 Cal.App.3d 1103, 1133 [286 Cal.Rptr. 85].)

The majority asserts that the district knew or reasonably should have known that the minor was subject to the risk of an assault, including a sexual

assault, from Chris. However, the majority does not adequately explain why this is so. The majority simply focuses on the victim's status. According to the lead opinion, the "unique vulnerabilities of special education students" (lead opn., *ante*, at p. 520) and the "unique responsibilities" associated with their instruction and their "special needs" (*id.* at p. 521) made this particular type of harm, i.e., a sexual assault, foreseeable. The deficiency in this analysis is that no consideration is given to whether it was reasonably foreseeable that another student would commit such a crime. Under California law, a duty to protect the minor from a sexual assault does not exist unless it was reasonably foreseeable that this kind of harm could occur. (*Leger v. Stockton Unified School Dist.* (1988) 202 Cal.App.3d 1448, 1459 [249 Cal.Rptr. 688].)

Although the law generally does not impose a duty on a defendant to control the conduct of another or to warn of such conduct, the special relationship that exists between a school district and its students may impose such a duty. (*Rodriguez v. Inglewood Unified School Dist.* (1986) 186 Cal.App.3d 707, 712, 715 [230 Cal.Rptr. 823].) However, this duty is not unlimited.

To determine the scope of a school district's duty to control the conduct of one of its students, the California Supreme Court has looked to the common law duty that parents owe third parties to supervise and control the conduct of their children. In *Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925 [80 Cal.Rptr.2d 811, 968 P.2d 522], the court noted that the relationship between school personnel and students is analogous in many ways to the relationship between parents and their children. (*Id.* at p. 934.) "At common law, '[s]chool officials are said to stand *in loco parentis*, in the place of parents, to their students, with similar powers and responsibilities.' " (*Id.* at p. 935.)

California law finds a special relationship between parent and child. (*Hoff v. Vacaville Unified School Dist., supra,* 19 Cal.4th at p. 934.) Accordingly, the parent has a duty to exercise reasonable care to control the minor child so as to prevent the child from intentionally harming others. (*Ibid.*) However, this duty of supervision is limited. The parent's " '[k]nowledge of dangerous habits and ability to control the child are prerequisites to imposition of liability.' " (*Id.* at p. 935.) " '[O]nly the manifestation of specific dangerous tendencies ... triggers a parental duty to exercise reasonable care to control the minor child in order to prevent ... harm to third persons.' " (*Ibid.*)

Applying this analysis here, it is my position that the district cannot be held liable for injuries arising out of this criminal conduct under a theory of negligent supervision unless it had *knowledge* of Chris's "specific dangerous tendencies," i.e., his tendencies to commit sexual assaults. Admittedly, Chris

was a discipline problem. However, defiance and disruption are not indications of such "dangerous tendencies." Further, Chris's prior acts of physical violence, i.e., punching respondent in seventh grade and kicking another student in the groin in eighth grade, would not lead one to reasonably anticipate that he would commit a sexual assault.

In contrast, the majority finds no distinction between a physical assault and a sexual assault for purposes of foreseeability in this case. The majority offers no justification for this position. Apparently, in the majority's view, each type of assault results in the same kind of harm. However, the facts of this case belie this conclusion. Before this sexual assault occurred, the minor had been physically assaulted, i.e., punched by Chris, without any apparent long-term adverse consequences. In contrast, the minor was devastated by this sexual assault. Moreover, if physical assaults and sexual assaults are considered equivalent in this context, school districts will be compelled to view every defiant and disruptive child as a potential rapist. This is an unreasonable burden.

Additionally, contrary to the majority, I consider the analogous situation presented in *Romero v. Superior Court* (2001) 89 Cal.App.4th 1068 [107 Cal.Rptr.2d 801], to be persuasive. There, the adult defendants were sued for negligent supervision when, after inviting two minors into their home, one was sexually assaulted by the other. The court found that the adults assumed a special relationship with the minors. (89 Cal.App.4th at p. 1081.) Nevertheless, the court held that under a nonfeasance theory of negligent supervision, the adults had no duty to protect the injured minor in the absence of *actual knowledge* of the offending minor's propensities. (89 Cal.App.4th at p. 1083.)

In reaching this conclusion, the *Romero* court adopted the rule set forth in *Chaney v. Superior Court* (1995) 39 Cal.App.4th 152 [46 Cal.Rptr.2d 73]. In *Chaney*, the court was faced with determining the extent of a wife's duty to her minor invitees to prevent sexual assaults perpetrated by her husband. The court noted that the wife's duty of reasonable care to the injured child depends on whether the husband's behavior was reasonably foreseeable. (*Id.* at p. 157.) However, "[w]ithout knowledge of her husband's deviant propensities, a wife will not be able to foresee that he poses a danger and thus will not have a duty to take measures to prevent the assault." (*Ibid.*) The court further held that, although a wife's knowledge may be proven by circumstantial evidence, it must reflect the wife's actual knowledge and not merely constructive knowledge or notice. (*Ibid.*) In other words, such deviant behavior is so shocking and outrageous that, as a matter of law, one cannot be charged with reasonably foreseeing the risk of harm unless one has actual knowledge of the perpetrator's propensities.

This "actual knowledge" requirement is equally applicable here. Without actual knowledge of Chris's deviant tendencies, the district could not reasonably foresee the danger he posed. The district had no knowledge of Chris's propensity to commit sexual assaults. Before this outrageous incident, there had never been any sexual misconduct at any school in the district for at least 31 years. These circumstances mandate the finding that it was not reasonably foreseeable that this junior high school boy would rape a special education student on school grounds.

The lead opinion dismisses the *Chaney/Romero* line of authority on the ground that "school grounds provide a different setting than an adult's home." (Lead opn., *ante*, at p. 524.) The lead opinion further states, without elaboration, that "there are differing public policy concerns related to the responsibilities of school districts that provide mandatory education as compared to adults who invite children into their home on a voluntary basis." (*Ibid.*) However, both school districts and adults who invite children into their homes are acting in loco parentis. Thus, in taking this position, the majority is effectively elevating a school district's duty to exercise reasonable care to control a minor child above that of a parent.

In sum, under these circumstances, the district should not be held liable for the sexual assault perpetrated by one of its students. The district had no knowledge of that student's propensity to commit such an act. Consequently, the district did not owe a legal duty to the minor to protect him from this unforeseeable event. Accordingly, I would reverse the judgment on this ground.

A petition for a rehearing was denied August 1, 2003, and appellant's petition for review by the Supreme Court was denied October 1, 2003. Baxter, J., Chin, J., and Brown, J., were of the opinion that the petition should be granted.