Filed 10/20/14  R.G. v. San Bernadino City Unified School Dist. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| R.G., a Minor, | |
| Plaintiff and Appellant, | G049924 |
| v. | (Super. Ct. No. CIVDS1000241) |
| SAN BERNARDINO CITY UNIFIED SCHOOL DISTRICT, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of San Bernardino, David Cohn, Judge.  Affirmed.

Mancini & Associates, Marcus A. Mancini, Christopher Barnes; Benedon & Serlin, Gerald M. Serlin and Kelly R. Horwitz for Plaintiff and Appellant.

Orrock, Popka, Fortino, Tucker & Dolen, Dennis G. Popka; Arias & Lockwood and Christopher D. Lockwood for Defendant and Respondent.

\*          \*          \*

Plaintiff R.G., a special education high school student, asserted she was raped by fellow high school student James. She filed a Government Torts Act claim, and upon rejection, sued defendant San Bernardino City Unified School District for negligent supervision and maintaining a dangerous condition of property. After plaintiff's case-in-chief, the court granted defendant's motion for nonsuit.

Plaintiff contends the court erroneously found defendant owed no duty to her and that she had not made a prima facie case that its student parking lot constituted a dangerous or hazardous condition of property. We disagree. The duties plaintiff seeks to impose were not mandated by enactment and she has not shown any physical feature of the lot made it a dangerous condition of property. The judgment is affirmed.

STANDARD OF REVIEW

On appeal from a nonsuit judgment, we "view the evidence in the light most favorable to the plaintiffs and . . . disregard conflicting evidence on behalf of the defendant. Only if, after indulging every legitimate inference favorable to plaintiffs, we find that there is no evidence of sufficient substantiality to support a verdict in plaintiffs' favor, can we uphold the judgment of nonsuit." (*Miller v. Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 699.) We state the facts with this standard in mind.

FACTS

Plaintiff is a special education student who attended a regular high school. She met James in Algebra class and they talked occasionally.

James received a one-day suspension, effective the day of the incident. When a student is suspended, the school is required to notify his or her parent or guardian. Each day, a list of suspended students is e-mailed to security guards and staff

2

and the suspension is noted on the teachers' computerized attendance record programs. Teachers must report a suspended student's presence in class to the administrative office.

Upon suspending James, the school tried to call James' legal guardian, but was unable to reach her. James also did not tell her about his suspension and went to school on the day of the incident. He went to his first class, physical education, but avoided his teacher and hid under a tree or blended in with other students by walking with them around the track. Before lunch, he twice encountered plaintiff, who had been given a hall pass and asked to find a student in another classroom. The second time, plaintiff went with James to the student parking lot where he raped her between two cars.

A camera mounted in the student parking lot has not worked since 2006. Five or six security guards patrol designated areas of the campus, including the student parking lot, and rotate during the day depending on where students are located. During lunch, no one monitors the student parking lot because the guard checks out students who leave campus for lunch. Upon seeing a suspended student, guards are to take steps to have the student removed from school grounds. They must also ensure students outside of ongoing classes have hall passes and take noncompliant students to the office or class, or report them to the vice-principal. No guard challenged James that day for not having a pass. Although James "ditch[ed]" classes every day and walked around campus, guards stopped him only about four times and merely told him to go to class or get a pass.

DISCUSSION

*1. Duty*

Plaintiff argues the court erred in finding defendant did not owe her a duty on her negligence claim. According to her, defendant had a duty to "create a safe and secure environment" by adhering to its safety plan because one "that exists in name alone" is insufficient, while compliance would have ensured "suspended students were not on campus," in hallways without permission during class, or loitering in the student

3

parking lot. Specifically, she urges defendant had a duty to enforce procedures for suspending students, contacting their parents or guardians, circulating a list of suspended students to teachers and security guards, ensuring students had hall passes when outside of ongoing classes, and having guards patrol the student parking lot throughout the day.

To summarize, although argued as a negligent supervision claim, what plaintiff actually asserts is that the safety plan created mandatory duties with which defendant had to comply. It did not.

"Under the Government Claims Act . . . , there is no common law tort liability for public entities in California; instead, such liability must be based on statute. (Gov. Code, § 815, subd. (a) ['Except as otherwise provided by statute: [¶] . . . A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity']." (*Guzman v. County of Monterey* (2009) 46 Cal.4th 887, 897 (*Guzman*); all further undesignated statutory references are to the Government Code.) "A private cause of action lies against a public entity only if the underlying enactment sets forth the elements of liability set out in section 815.6." (*Ibid.*) An "[e]nactment" is "a constitutional provision, statute, charter provision, ordinance or regulation." (§ 810.6.)

For liability under section 815.6, "'[f]irst . . . the enactment at issue must be *obligatory*, rather than merely discretionary or permissive, in its directions to the public entity; it must *require*, rather than merely authorize or permit, that a particular action be taken or not taken. [Citation.] It is not enough, moreover, that the public entity or officer have been under an obligation to perform a function if the function itself involves the exercise of discretion. [Citation.]' [Citation.] Courts have construed this first prong rather strictly, finding a mandatory duty only if the enactment 'affirmatively imposes the duty and provides implementing guidelines.'" (*Guzman*, *supra*, 46 Cal.4th at p. 898; *Clausing v. San Francisco Unified School Dist.* (1990) 221 Cal.App.3d 1224, 1240 ["If rules and guidelines for the implementation of an alleged mandatory duty are not set forth in an otherwise prohibitory statute, it cannot create a mandatory duty"] (*Clausing*).)

4

"'Second, but equally important, section 815.6 requires that the mandatory duty be "designed" to protect against the particular kind of injury the plaintiff suffered. The plaintiff must show the injury is "'one of the consequences which the [enacting body] sought to prevent through imposing the alleged mandatory duty.'" [Citation.] Our inquiry in this regard goes to the legislative *purpose* of imposing the duty. That the enactment "confers some benefit" on the class to which plaintiff belongs is not enough; if the benefit is "incidental" to the enactment's protective purpose, the enactment cannot serve as a predicate for liability under section 815.6. [Citation.]' [Citations.] If these two prongs are met, the next question is whether the breach of the duty was a proximate cause of the plaintiff's injury." (*Guzman*, *supra*, 46 Cal.4th at p. 898.)

"'Whether a particular statute is intended to impose a mandatory duty, rather than a mere obligation to perform a discretionary function, is a question of statutory interpretation for the courts.' [Citations.] We examine the 'language, function and apparent purpose' of each cited enactment 'to determine if any or each creates a mandatory duty designed to protect against' the injury allegedly suffered by plaintiff." (*Guzman*, *supra*, 46 Cal.4th at p. 898.)

### a. Section 815.2

Under section 815.2, subdivision (a), "'a school district is vicariously liable for injuries proximately caused by [the] negligence' of school personnel 'responsible for student supervision.'" (*Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 932.) Because of the special relationship between a school district and its students "arising from the mandatory character of school attendance and the comprehensive control over students exercised by school personnel," school authorities have "'a duty to "supervise at all times the conduct of the children on the school grounds and to enforce those rules and regulations necessary to their protection."'" (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 869 (*C.A.*).) They must "use reasonable

measures to protect students from foreseeable injury at the hands of third parties acting negligently or intentionally," a "principle [that] has been applied in cases of employees' alleged negligence resulting in injury to a student by another student." (*Id*. at p. 870, fn. omitted.)

At the same time, "'school districts and their employees have never been considered insurers of the physical safety of students.'" (*C.A.*, *supra*, 53 Cal.4th at p. 869.) "Students are not at risk merely because they are at school, and schools, including school restrooms, are not dangerous places per se." (*M.W. v. Panama Buena Vista Union School Dist*. (2003) 110 Cal.App.4th 508, 519 (*M.W.*).) Neither are school parking lots. "A contrary conclusion would unreasonably 'require virtual round-the-clock supervision or prison-tight security for school premises.'" (*Leger v. Stockton Unified School Dist*. (1988) 202 Cal.App.3d 1448, 1459.)

Although "'a total lack of supervision [citation] or ineffective supervision [citation] may constitute a lack of ordinary care on the part of those responsible for student supervision'" (*C.A.*, *supra*, 53 Cal.4th at p. 869), plaintiff does not claim either she or James were inadequately supervised. Rather, she asserts the security plan "established the existence and scope of [defendant's] duty to [her]." (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214 ["duty analysis . . . requires the court . . . to identify the specific action or actions the plaintiff claims the defendant had a duty to undertake," which constitutes "'the scope of the duty under consideration'"].)

The issue, as noted above, is thus whether defendant had a duty to comply with the cited aspects of its security plan, not whether it negligently supervised plaintiff or James. Consequently, the negligent supervision cases cited by plaintiff are inapposite. (See *J.H. v. Los Angeles Unified School Dist.* (2010) 183 Cal.App.4th 123, 148 [school district had duty to use reasonable care in supervising afterschool playground program]; *Jennifer C. v. Los Angeles Unified School Dist.* (2008) 168 Cal.App.4th 1320, 1328 [school district had duty "to adequately supervise" special needs student and "eliminate

6

hidden areas" such as alcoves "where victimization can occur"]; *M.W.*, *supra*, 110 Cal.App.4th at p. 521 [school district had duty "to ensure adequate supervision for any students they permit on their campuses prior to the start of school"].)

### b. Safety Plan

Local standards, rules, practices, and policies are not enactments imposing a mandatory duty. (*Wilson v. County of San Diego* (2001) 91 Cal.App.4th 974, 982 [county child care manual requiring supervision of child by adult at all times did not create mandatory duty].) Because a mandatory duty must be established by an enactment or regulation that has the force of law, it cannot be based on """"informal 'guides,' 'policy manuals,' and 'recommended procedures' helpful in establishing the standards of statutes, but lacking the force of law."""" (*Posey v. State of California* (1986) 180 Cal.App.3d 836, 849 [internal CHP procedures do not create mandatory duty].) Nor can it be premised on a school safety manual. (*Searcy v. Hemet Unified School Dist.* (1986) 177 Cal.App.3d 792, 799-801 [no mandatory duty created by School Area Pedestrian Safety Manual, which merely provided advisory guidelines "recommend[ing] standards and procedures aimed at bringing about desireable safety conditions"]; see *Cerna v. City of Oakland* (2008) 161 Cal.App.4th 1340, 1359-1360 ["We see no basis for holding that a school district specifically assumes liability for student conduct and safety by adopting advisory safety guidelines"].)

Thus, any claim defendant owed duties to plaintiff based on its safety manual alone fails. Rather, the asserted duty must be supported by an enactment specifically intended to guard against plaintiff's particular injury. None exists.

### c. Statutes Cited by Plaintiff

Plaintiff does not claim defendant had a duty to expel James and admits it "already" complied with its procedure for suspending James under Education Code

7

sections 48900 and 48911, subdivision (a). And although plaintiff asserts the school's policy required it to actually speak with a parent or guardian, Education Code section 48911, subdivision (d), upon which this procedure is based, demands only "a *reasonable* effort to contact the pupil's parent or guardian in person or by telephone." (Italics added.) Here, when James was suspended, defendant telephoned his grandmother to report the suspension but was unable to reach her.

In any event, Education Code sections 48900 and 48911 do not create mandatory duties for a school district. Although they use mandatory language to provide for children's access to an educational setting as well as a set of suspension and expulsion procedures designed to provide due process for the person being suspended, the statutes are directed toward attaining stated educational goals, not to provide safeguards against a particular type of injury. (*Tirpak v. Los Angeles Unified School Dist.* (1986) 187 Cal.App.3d 639, 642-643.)

There is also no mandatory duty to keep a suspended student away from school. Education Code section 48925, subdivision (d) defines a "'suspension' [as] removal of a pupil from ongoing instruction for adjustment purposes." It did not obligate defendant to ensure James remained off campus for the duration of his suspension and in fact allows a student to be "[r]eassigned to another education program or class *at the same school* where the pupil will receive continuing instruction *for the length of day* prescribed by the governing board for pupils of the same grade level." (Ed. Code, § 48925, subd. (d)(1), italics added.)

The purpose of suspending and removing students from class is also not to protect plaintiff against the particular kind of injury she suffered. (*Guzman*, *supra*, 46 Cal.4th at p. 898.) Rather, it is to correct and punish the misconduct of the person being suspended. (See *Thompson v. Sacramento City Unified School Dist*. (2003) 107 Cal.App.4th 1352, 1363-1364; *Slayton v. Pomona Unified School Dist*. (1984) 161 Cal.App.3d 538, 550.)

8

Nor is there any mandatory duty compelling defendant to circulate a list of suspended students to faculty and security guards, require hall passes for students not in class, or have security guards patrol the student parking lot.

California Constitution, article I, section 28, subdivision (f)(1) (former art. I, § 28, subd. (c)), as amended by Initiative Measure (Prop. 9, § 4.1, approved Nov. 2008, eff. Nov. 5, 2008)) provides the "inalienable right to attend campuses which are safe, secure and peaceful" to all students attending public schools. But "[t]he right proclaimed in [this subdivision], although inalienable and mandatory, simply establishes the parameters of the principle enunciated; *the specific means by which it is to be achieved for the people of California are left to the Legislature*." (*Clausing*, *supra*, 221 Cal.App.3d at p. 1237, fn. omitted, italics added.) It did not impose a duty on defendant to establish any particular procedure. It also "is not self-executing, in the sense that it does not provide an independent basis for a private right of action for damages. Neither does it impose an express affirmative duty on any government agency to guarantee the safety of schools." (*Id.* at pp. 1237-1238.)

Various provisions of the Education Code carry out this directive. But the sections referenced by plaintiff require only that school districts develop safety plans. (See Ed. Code, §§ 32281, subd. (a) ["Each school district and county office of education is responsible for the overall development of all comprehensive school safety plans for its schools operating kindergarten or any of grades 1 to 12, inclusive"], 32282, subd. (a)(1), (2) ["comprehensive school safety plan shall include, but not be limited to" assessing "school crime" and "[i]dentifying appropriate strategies and programs that will provide or maintain a high level of school safety and address the school's procedures for complying with existing laws related to school safety"]; 44276.1, subd. (b) [Legislature's intent was "that a comprehensive school safety plan be established . . . to achieve safe, secure, and peaceful school campuses"].)

9

Although these statutes are mandatory in the sense they compel school districts to formulate plans in order to provide a safe and secure campus, they are merely "statement[s] of public policy, not a directive to any agency . . . on how to implement that policy." (*Building Industry Assn. v. Marin Mun. Water Dist.* (1991) 235 Cal.App.3d 1641, 1650.) "A 'general statement of public policy' cannot serve as the basis for a mandatory duty under section 815.6." (*Tuthill v. City of San Buenaventura* (2014) 223 Cal.App.4th 1081, 1090.) The drafting of procedures for the circulation of suspension lists, hall passes, and placement of security guards are matters that "'would unquestionably fall in the category of discretionary "basic policy decisions" for which governmental agencies usually are insulated from civil liability.'" (*Guzman*, *supra*, 46 Cal.4th at p. 899.) They were not mandatory duties imposed by enactment on defendant.

## 2. *Dangerous Condition of Property*

Plaintiff contends certain conditions in the student parking lot constituted a dangerous condition of property under section 835. We disagree.

Section 835 makes a public entity liable for a dangerous condition of property creating a foreseeable risk of injury if the entity had sufficient notice to take corrective measures. "The existence of a dangerous condition is ordinarily a question of fact but 'can be decided as a matter of law if reasonable minds can come to only one conclusion.'" (*Cerna v. City of Oakland*, *supra*, 161 Cal.App.4th at p. 1347.) A "'[d]angerous condition'" is "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." (§ 830.)

Liability for a dangerous condition may occur where a physical characteristic of the property "'exposes its users to increased danger from third party negligence or criminality[,] . . . [b]ut it is insufficient to show only harmful third party

10

conduct . . . . '"[T]hird party conduct by itself, unrelated to the condition of the property, does not constitute a "dangerous condition" for which a public entity may be held liable."' [Citation.] There must be a *defect in the physical condition of the property and that defect must have some causal relationship to the third party conduct* that injures the plaintiff. [Citation.] "[P]ublic liability lies under section 835 only when a feature of the public property has '*increased or intensified*' the danger to users from third party conduct."'" (*Mixon v. Pacific Gas & Electric Co.* (2012) 207 Cal.App.4th 124, 131, italics added (*Mixon*).)

Plaintiff asserts the following were "defects" in the student parking lot: (1) it contained cars "that would obstruct observation of the crime"; (2) its camera had been inoperative since 2006; and (3) "outbuildings on the perimeter of the parking lot created line of sight problems for security guards." The first two did not constitute a dangerous condition of property and the third is not supported by the evidence.

Having cars in a parking lot was not a defect in the physical condition of the parking lot. It is the purpose of a parking lot. Cars are generally driven there on a day-to-day basis and parked; they are not anchored or affixed to, or in any way a part of the parking lot. They are not a *feature* of the property.

Neither are security cameras. In this regard, plaintiff supplies no legal authority or reasoned analysis establishing that security cameras were required in the first place in order to avoid exposing users of the parking lot to increased danger from third party criminality. She thus forfeited any claim in that respect. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.) The undisputed evidence in this case also shows to the contrary. First, not all schools have security cameras. Second, defendant retained its expert sometime after plaintiff filed her complaint in 2010. By then, the security camera had not worked for approximately four years. Nevertheless, the defense expert opined that defendant's security and safety plan, which included the nonworking security

11

camera, met the standard of care. This opinion was uncontradicted because plaintiff's expert had been excluded due to lack of qualifications.

Plaintiff speculates that because defendant installed a camera in the student parking lot, defendant knew "it was foreseeable that the parking lot would be a choice location for criminal activity." But cameras were placed all over the campus, not only in the student parking lot. There mere fact one was in the parking lot did not make it any more foreseeable that a crime occur there as opposed to any other location on campus.

Further, there was no evidence of any prior crimes in the student parking lot that would have made her alleged rape foreseeable due to the lack of a working camera. Defendant was unaware of any assaults occurring in the student parking lot between August 2006 and the date of the incident or of any students engaging in sexual conduct on campus before the one at issue. The absence of evidence of similar accidents during the period the camera had been inoperative is relevant and supports the court's finding that the evidence was legally insufficient to support a verdict against defendant for maintaining a dangerous condition of property on that basis. (See, e.g., *Sambrano v. City of San Diego* (2001) 94 Cal.App.4th 225, 243 [undisputed evidence there had not been any reports of similar injuries]; *Clarke v. Michals* (1970) 4 Cal.App.3d 364, 372 [uncontradicted evidence that no prior claim or complaint about allegedly dangerous condition had been received by the defendant city].)

Moreover, the evidence cited by plaintiff demonstrates the cameras were not installed to "deter[]" crimes as plaintiff claims, but to investigate "after the incident situations" to "determine what actually happened." In fact, the cameras had never been monitored in real time. If an *operative* camera was reviewed only *after* incidents had occurred, an *inoperative* camera could not have "'increased or intensified' the danger to" plaintiff from James. (*Mixon*, *supra*, 207 Cal.App.4th at p. 131.)

*Constantinescu v. Conejo Valley Unified School Dist*. (1993) 16 Cal.App.4th 1466, cited by plaintiff, is inapposite. There, the defendant "helped create

12

traffic congestion that was particularly dangerous" by "convert[ing] a small lot . . . into . . . a place . . . a jury could reasonably conclude . . . was dangerous within the meaning of section 830." (*Id.* at pp. 1473-1474.)  Here, defendant did not help create a dangerous condition by failing to fix a camera it had no obligation to provide.

Finally, plaintiff's evidence does not support her "line of sight" claim.  The only evidence she cites is testimony from James that upon arriving at the auto shop building after wandering through the quad area and around campus with plaintiff, they had a discussion about "making out."  They went to another area in front of a classroom where they made out for two minutes.  James was told he and plaintiff were seen "walking around on the campus on camera, but they didn't see us out here."  He does not explain where "out here" is and had "no idea" if anyone saw them there.  Nothing in this testimony suggests "outbuildings on the perimeter of the parking lot created a line of sight problems for security guards," as contended by plaintiff.

DISPOSITION

The judgment is affirmed.  Defendant shall recover its costs on appeal.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

MOORE, J.

THOMPSON, J.

13