[No. B211052. Second Dist., Div. Three. Mar. 25, 2010.]

J.H., a Minor, etc., Plaintiff and Appellant, v.
LOS ANGELES UNIFIED SCHOOL DISTRICT et al., Defendants and
Respondents.

**COUNSEL**

Kreindler & Kreindler, Stuart R. Fraenkel, Gabriel S. Barenfeld, Jennifer J. Terando; Law Offices of Howard C. Kornberg and Howard C. Kornberg for Plaintiff and Appellant.

Carlson & Messer, Jeffery J. Carlson, Jeanne L. Zimmer and Edgar N. De Vera for Defendants and Respondents.

**OPINION**

**CROSKEY, J.**—Plaintiff and appellant J.H., a minor child (plaintiff), by and through her mother and guardian ad litem, Kami Shade Agbeti (Mother), appeals from a summary judgment entered in favor of the Los Angeles Unified School District (the school district), and three of its employees. The judgment was entered after the trial court granted summary adjudication against plaintiff on three of the four causes of action she alleged against the school district and the employees and plaintiff dismissed the remaining cause of action against them. Plaintiff also dismissed all of the causes of action she asserted against the other defendants in the case.

The case concerns physical and sexual assault and battery that plaintiff sustained at one of the school district's grade school campuses during a voluntary after-school program. The persons inflicting the harm on plaintiff were also students who attended the program. The trial court ruled that whereas school districts have an affirmative duty of care to students because of the compulsory nature of education, generally there is no duty of care with respect to children who participate in voluntary after-school programs.

However, our review of the relevant case law, statutes, and regulations, as well as the facts of this case as set out in the parties' summary judgment/adjudication evidence, convinces us that the summary judgment must be reversed because defendants did owe a duty of care to plaintiff, and the questions whether defendants were negligent in running the after-school program, and if so, whether such negligence was a proximate cause of plaintiff's injuries, must be left to the trier of fact.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Initiation of the Suit

Named as defendants in this case are the school district, the elementary school where plaintiff was assaulted (the school), the principal of the school, Susan Babit (the principal), Susan Lasken, the assistant principal (the assistant principal), and Casey Bednash, an after-school playground supervisor (the playground supervisor, and collectively with those defendants, defendants).[1]

According to the complaint, in March 2005 plaintiff began attending the school as a second grade student. She also began attending one of the school's two after-school programs, one of which requires payment for enrollment. The after-school program plaintiff attended, which is held on the school's playground, does not require payment, but it has far less supervision for the children who attend it than the other program. There are 200 to 300 children on the playground participating in this free after-school program and only two adults providing supervision.

The complaint further alleged that on April 6, 2005, plaintiff was attending her after-school program and playing with a group of four students, Alice, Bobby, Pat and Robin.[2] These four students were members of a group known as the "kissing club." The principal, assistant principal and playground supervisor knew of the kissing club. Indeed, it was common knowledge among faculty, employees and some students that members of the kissing club, including Alice and Bobby, engaged in impermissible sexual activities, and that Alice and Bobby had a history of discipline problems. While plaintiff

---

[1] Also named as defendants are the minor students, who the evidence shows assaulted plaintiff, and their parents.

[2] Plaintiff's complaint makes specific reference to a total of five students who attended the subject after-school program. The complaint uses only the initials of the children to identify them. To further protect the identity and privacy of those students, as well as to facilitate the reading of this opinion, we have substituted fictitious first names in place of the children's initials.

was playing with the four students, Alice, Pat and Robin encouraged Bobby to kiss plaintiff, and Bobby forced himself on her. Plaintiff could feel Bobby's tongue on her cheek and in her mouth. Two days later, during the after-school program, plaintiff was playing with some other children near an unlocked storage shed on the school grounds. Alice grabbed plaintiff and pulled her inside the shed, held plaintiff there against her will, repeatedly slapped plaintiff in the face, and then forced plaintiff to the ground while Bobby pulled down plaintiff's pants and put his penis and testicles on plaintiff's buttocks and his penis in between her buttocks. At the time of both incidents, defendant playground supervisor was either the only adult supervising plaintiff's after-school program or, at most, there were only two supervisors there. When plaintiff returned to school three days later on Monday, April 11, she was teased and taunted by children who had witnessed or heard about the incident.

The complaint also alleged that a child who witnessed the incident, Tammy, reported it to defendant playground supervisor on April 12. On the same day, Mother learned of the incident and reported it to the police. No one from the school contacted the police or any other authority. As part of the investigation into the matter, plaintiff was required to have doctors examine and photograph private parts of her body, and was required to submit to hours of questions by the police, doctors and investigators.

Plaintiff's first cause of action, for negligent supervision of school premises, alleged defendants had a special relationship with plaintiff and an affirmative duty to take reasonable steps to protect her, including a duty to have competent employees supervise children in the after-school program, but defendants breached their duty by failing to provide adequate supervision of the children in that program, failing to break up or monitor the kissing club, and failing to lock the storage shed and deny access to it to the children. As a result of the breach, it is alleged that plaintiff suffered injuries and mental and emotional distress, and incurred costs of medical attention and continuing psychological counseling. The complaint alleged a second cause of action against the school district and the school for failure to properly supervise and train employees to ensure the safety of children in the after-school program.

Additionally, plaintiff alleged a cause of action against defendants for violation of California Constitution, article I, section 28, subdivision (a)(7), which declares that the right to public safety extends to schools, colleges and universities such that "students and staff have the right to be safe and secure in their persons"; violation of *Government Code* section 44807[3]; violation of

---

[3] Apparently the intended reference in the pleading was to *Education Code* section 44807, which requires teachers in public schools to "hold pupils to a strict account for their conduct on the way to and from school, on the playgrounds, or during recess."

Education Code section 8202, subdivisions (a) and (b) in which the Legislature indicated its intent that, among other things, "[a]ll families have access to child care," and "[t]he healthy physical, cognitive, social, and emotional growth and development of children be supported"; and, finally, violation of California Code of Regulations, title 5, section 5552, which provides for supervision of playgrounds for safe play before, during and after school.[4] A fourth cause of action alleges defendants violated Penal Code section 11166 by failing, as mandated reporters, to report the incidents of child abuse to an appropriate agency.

### 2. Defendants' Summary Judgment Motion

The school district, principal, assistant principal and playground supervisor, all represented by the same law firm, filed a motion for summary judgment or alternatively summary adjudication of issues (defendants' motion). Regarding the first three causes of action, defendants' motion asserted that on the two days the kissing club incidents occurred, the special relationship between plaintiff and the school district ended prior to the time of the incidents because plaintiff and the other students had already left the portion of the school campus that is devoted to the after-school program and gone to the other side of the campus where the storage shed was located, where they knew they were not allowed. Defendants further claimed that even if there was a special relationship between plaintiff and the school district when the incidents occurred, the incidents were not foreseeable as a matter of law and therefore there was no duty to protect plaintiff, and moreover there is no causal connection between an unlocked storage shed and the assaults on plaintiff. Regarding the fourth cause of action (failure to report incidents to proper authorities), defendants asserted it is barred because it was not asserted in the government claim filed by Mother prior to her filing this suit.[5]

Each of the three individual defendants (principal, assistant principal, and playground supervisor) submitted a declaration in support of defendants' motion. According to the declarations, the school district's "youth services section" runs an after-school playground program (ASPP) at nearly all of the school district's elementary schools, including the subject school. There is no formal enrollment in the ASPP. The ASPP is free of charge to students, is taxpayer funded, and is an attempt by the school district to provide an

---

[4] California Code of Regulations, title 5, section 5552 states: "Where playground supervision is not otherwise provided, the principal of each school shall provide for the supervision by certificated employees of the conduct and safety, and for the direction of the play, of the pupils of the school who are on the school grounds during recess and other intermissions and before and after school."

[5] Actually, the claim filed by Mother with the district states that "[n]o one at the school contacted the police or any other authority."

after-school environment that is better for the students than being on the street. Students who use the ASPP have discretion to arrive and leave whenever they choose. Other after-school activities were, and are, offered elsewhere on the school's campus. One example is "the Enrichment After School Experiences ('EASE') program," which is owned and run by a private company using non-school-district employees, and which leases the school district's property at the school after the regular school day ends, and charges tuition and other fees.

The declarants stated that in April 2005, the ASPP "was operated on only a portion of the northernmost end of [the subject school's] four-acre campus. The . . . program did not provide supervision beyond its boundaries, and the remainder of the campus was closed and off-limits to [the] program participants and anyone else without a valid reason to be there." The area where the April 8 incident occurred, and where the students discovered an unlocked storage shed, is located in the southernmost part of the school's campus, approximately 170 yards beyond the boundaries of the ASPP area. Classroom buildings prevent the shed from being seen from the ASPP area. The playground supervisor added in his declaration that his duties as an ASPP playground supervisor included "supervis[ing] the children who chose to participate in the [ASPP] on any particular day." He stated the program operated from 2:25 p.m., when school was dismissed, to 6:00 p.m., he was "always there for the entire time," and he worked on both April 6 and 8, 2005.

The declarants stated they had not heard of any improper incidents involving plaintiff, Alice and Bobby until the April 8, 2005 incident was reported to the playground supervisor on April 12, 2005. Defendant playground supervisor added that on April 12, 2005, the child we have identified as Tammy reported to him that plaintiff, Alice, Bobby, and two other students had created a kissing club behind some classroom buildings on the other side of the school's campus and had engaged in sexual activities there. Prior to Tammy's report to the playground supervisor, none of the declarants had information or reason to believe that a kissing club existed in the ASPP, or that sexual misconduct had occurred. The declarants did not know or have reason to believe that Bobby and Alice had engaged in sexual activities before the incidents, and they still do not know of such prior sexual conduct, nor did they know or have reason to believe that Bobby and Alice had a propensity to sexually assault other students prior to April 12, 2005.

The principal and assistant principal included in their declarations statements that (1) "[t]here were no prior incidents involving [Alice] and [Bobby]

that could potentially cause suspicion that they had a propensity to commit acts of sexual assault. [Alice] and [Bobby] had no history of disciplinary problems at all"; and (2) "[o]ther than the alleged incidents of April 6 and 8, 2005, there has never been any sexual misconduct at [the subject school] to [the declarants'] knowledge." The playground supervisor did not include those comments in his declaration even though the statements made by him in his declaration tracked those made by the principal and the assistant principal in other respects.

Also offered in support of defendants' motion were pages from a deposition given by plaintiff. She testified that there was a day when Alice took her to "a shack" "which was behind one of the classes in the bungalows." Asked if she knew that she was not supposed to be behind there at that time, plaintiff answered: "Yes." Asked why she went there, plaintiff answered: "Because I wanted to be—Because I was scared. I wanted to see what it was." She stated that she, Alice, Bobby and another boy went there. Alice began hitting plaintiff and asked her to kiss Bobby, and Bobby kissed plaintiff on the cheeks. After that happened, plaintiff did not tell anyone at school that Alice slapped her because she was afraid of being embarrassed and afraid of what Alice would do to her if she told anyone. She also did not tell her parents. On another day, Alice "came up to all of us and told us to go to the shack." By "all of us," plaintiff meant "[t]he members of the club" and the members were plaintiff, Alice, Bobby, and another boy. Plaintiff testified Bobby put his private parts against her. Bobby was upset at that time and plaintiff was crying. Asked if Bobby "just rub[bed] his private up against you, or did he actually go inside your butt," plaintiff answered that he "rubbed his private against me."

### 3. *Evidence Presented In Opposition to Defendants' Motion*[6]

A Los Angeles Police Department report indicates that the incidents occurring at the school on April 6 and 8, 2005, were reported to the police by Mother on the evening of April 12, 2005. Mother contacted the police on that date after the playground supervisor told her about the April 8 incident when she came to pick up plaintiff at school. Mother told the police that the

---

[6] Defendants made objections to portions of the evidence plaintiff submitted in support of her opposition to their motion. We have reviewed the trial court's evidentiary rulings under an abuse of discretion standard (*Great American Ins. Cos. v. Gordon Trucking, Inc.* (2008) 165 Cal.App.4th 445, 449 [81 Cal.Rptr.3d 65]), and have included in our opinion the evidence the court improperly excluded.

We observe that despite the nearly 200 pages of evidence submitted by plaintiff in support of her opposition to defendants' motion, her evidence is essentially unmentioned by defendants in their appellate brief.

playground supervisor told her he had learned of the April 8 incident from one of the children who participates in the ASPP, and he interviewed separately all of the children whom he was told were involved. The police report states that a female officer interviewed plaintiff, and after listening to what the child told her, the officer "determined a sexual assault had occurred." The police report describes plaintiff as "a 7 year old vict. of a sexual assault." Plaintiff was taken by the police to the Children's Assault Treatment Service for an interview and examination. The examination revealed no visible injury to her.

When he was interviewed by the police, Bobby reported that he went to the shed on the playground and Alice "told him to kiss [plaintiff] or she would slap them" and so he kissed plaintiff on the cheek. Then Alice "told [plaintiff] to pull down her pants and have sex with [Bobby] 'like adults' " and when plaintiff refused, Alice slapped plaintiff twice and plaintiff pulled down her pants. Alice then told Bobby to pull down his pants and when he refused he was slapped by Alice and so he pulled his pants down. Alice told him to put his privates on plaintiff's butt and he did so even though he knew it was wrong because he did not want to be slapped anymore by Alice. After that occurred, the children dressed and they all went out to the playground.

When Alice was interviewed by the police, she had a different version of why she slapped plaintiff. She said she was told by Bobby to slap plaintiff. Alice also had a different version of why plaintiff pulled down her pants; Alice said it was pursuant to the directive of Bobby. When the police officer told Alice that plaintiff and Bobby both said it was Alice who told them to pull down their pants and have sex like adults, Alice covered her face in her hands, looked down, began to cry, and asked the officer if the officer thought she was "bad."

The principal's report to the school district indicates the playground supervisor learned of the April 8 incident from a fifth grade child who told him that plaintiff confided in her about what had happened. The report states that two incidents occurred; one was on April 5 or 6, and the other was on April 8. Regarding the April 8 incident, the report states that Alice threatened and hit the students to get them to go to the shed. When they were interviewed at the school, Alice and Bobby blamed each other for the April 8 incident. Each said the other made them do the things that transpired. The report indicates Bobby admitted to taking off his pants and rubbing his testicles against both plaintiff and Alice, and he asserted that Alice threatened and slapped him when he did not do as she commanded. The report also states that Alice is "often is inappropriate with her friends." Plaintiff and Alice were in the second grade at the time of the incidents. Bobby was in the

first grade. Alice's school records indicate that in kindergarten and second grade her teachers described her as having had difficulty interacting with other students.

A September 2006 school district-issued bulletin from the "Beyond the Bell Branch" of its Youth Services program states that it replaces a 2004 bulletin "of the same subject" and was updated to reflect the current assistant superintendent over the Beyond the Bell Branch and a "change in policy from age appropriate to grade appropriate for Youth Services participants." The bulletin makes the suggestion to schools that parents be given a bulletin telling them about the ASPP and informing them that the ASPP is supervised, the playground occasionally may be closed "due to the absence of supervision," the program is not child care and participants arrive and leave at their own discretion, and while at the program the participants must conduct themselves in a manner consistent with the rules and regulations of the school and playground.

An undated bulletin from the school district's Beyond the Bell Branch is entitled "General Policies, Procedures and Guidelines." Under the heading "campus security" it indicates that security "is a critical element that must be reviewed frequently in an effort to maintain optimal safety for our students." Members of the staff are reminded that "[w]hile on duty [they should] circulate throughout the play areas and remain cognizant of the activities of all individuals on the playground as well as the areas around access/egress gates."

Under the heading "good supervision," another portion of that same bulletin emphasizes the importance of good supervision and observes that "[t]he duty to supervise may be the least understood and the least accepted responsibility of those in charge of youth sports, physical education, and recreation programs. The failure to supervise properly is the reason most often cited for calling teachers and coaches into court. [¶] The problem is that while most athletic and recreational professionals know there is a duty to supervise, too few understand what is meant by adequate supervision. [¶] There are various levels of supervision required in different situations, depending on the type of activity and the age and skill level of the participants. However, in all cases supervision means more than just being there. It requires foresight (the ability to anticipate and eliminate or minimize potential hazards) and control of the situation. Supervision also requires both quantity (enough supervisors to attend to all participants) and quality (training in the specific activity and in supervisory skills)." The bulletin lists several steps to be followed for achieving good supervision, and one of them is to "[i]nspect . . . the entire playground before initiating any activity."

During her deposition, the principal opined that it is not appropriate for a young child to be in a place where there is no direct supervision. She stated that the Youth Services program was an open playground, like "going to the park" and geared to children who are responsible and can follow directions and follow rules. It is not structured as a child care situation. She added that the school district puts the second grade as the starting point for when children can participate. Asked if second grade is too young, she stated it depends on the individual child and some are more mature and can handle the situation. The principal indicated that the storage shed in which the April 8 incident was described as taking place was supposed to be locked on that day because it is the custom and practice of the people in charge of the school to keep sheds locked. She stated the sheds are locked for the security of items placed in them and for the students' security, and it would be difficult to supervise students in a shed because they are out of sight. In her deposition, the assistant principal testified that after the subject incidents occurred, she spoke with someone with Youth Services about the need for additional supervisors at the school.

A Timothy Bower testified at his deposition that the school district's Beyond the Bell Program is an administrative division of the school district that oversees programs that operate before and after school and the Youth Services section is one of its components. The money to fund the Youth Services program comes from the school district. The guidelines for the Youth Services program in place at the subject school required at least one paid adult employee to supervise students regardless of the number of students, and required "general supervision of the areas that are visible to the employee on the playground," including circulating the playground and observing whether any students had wandered off the playground. Based on the time sheet for playground supervision on April 8, 2005, Bowers stated it appeared that only defendant playground supervisor was supervising the APSS program at the subject school that day.[7]

Bower testified further that comprehensive after-school programs are another component of the Beyond the Bell Program. Comprehensive after-school programs are funded by federal and state grants in which students are enrolled and signed in and out on a daily basis and in which there is a set ratio of students to adults (20 to one), and the students are involved in structured activities, including academic assistance enrichment and recreation. The mandatory student-to-adult ratio is part of the grant legislation. Bower

---

[7] Defendant playground supervisor's attendance report for April 8, 2005, the day of the sexual assault on plaintiff, shows there were 113 children participating in the APSS program on that day.

testified that he was not aware whether the subject school had a comprehensive after-school program in April 2005.

At his deposition, defendant playground supervisor testified that when he was supervising the children, there was no place that he was normally located. He had boundaries on the playground, and the children were not allowed to go past them. To inform the children where the boundaries were, he would "gather[] the kids around a couple times a week, or a couple times a month even and let them know where they weren't allowed, where they were allowed to go, where they were supposed to go." There were restrooms and two classrooms beyond that boundary. As part of his supervision duties he would check the bathrooms that were within the boundary but he did not go into the bathrooms. After the incidents involving the plaintiff occurred, he put "cones across the playground."

Defendant playground supervisor further testified that at the time of the April 2005 incidents there were bungalows adjacent to the school yard. There were no barriers to prevent children from going behind the bungalows but that did "[n]ot necessarily" make it more difficult for him to keep track of the children. "From most places on the school yard [his] line of vision [would] be obstructed in the area behind the bungalows." Asked if he ever walked to the area behind the bungalows to see if any children were playing there, he stated he "would generally walk around every day, circulate the whole playground." At that point in the deposition the parties agreed that reference to bungalows at the deposition would mean the bungalow where the subject shed is located, also known as the "east bungalow." The shed was behind the east bungalow and the shed was located on school property. The playground supervisor stated that from time to time he would walk back to the area behind the east bungalow to check if students were back there. Prior to April 8, 2005, he had no knowledge that students were going into the shed and he had never seen students playing back there. He had never heard of students referring to the shed as the cabin. Asked if the shed should have been locked at the time the incident occurred, he stated he was not sure.

In her own declaration submitted in opposition to defendants' motion, Mother stated that plaintiff often participated in the school's ASPP. It was Mother's understanding that the program would provide adequate adult supervision for plaintiff until Mother or her husband could pick plaintiff up at school after they left work. Mother had a discussion with defendant principal of the school about the sexual assault on plaintiff. The principal said that supervision of children in the ASPP was seriously flawed and changes needed to be made so that such incidents would not happen again. Among the

changes the principal mentioned were concentrating the ASPP children in a small area because the school's playground was too large for two supervisors to handle, and having a third adult supervisor on the playground during the ASPP. Mother stated that had she known about the inadequate supervision, she would not have allowed plaintiff to participate in the ASPP. The principal told Mother there was another after-school program with better supervision. However, it was a fee-based program.

At her deposition, Mother was asked what the principal had said when Mother told her that Bobby had kissed plaintiff and put his tongue in her mouth. Mother stated the principal was "very casual" and told her that the children had a kissing club after school and the club had been going on for awhile but the students had not reported that anything had happened.

At her deposition, plaintiff was asked what kinds of things she and Alice did at school. Plaintiff stated they played handball during school and after school they played basketball. Plaintiff stated Alice asked her if she wanted to be in a club but did not tell her what kind of club. Plaintiff was curious and answered she did want to be in the club. There were four people in the club including herself, Alice, Bobby and another boy whose name she did not know. She stated she (plaintiff) and Bobby did not get along well. Asked what types of things Alice wanted the people in the kissing club to do, plaintiff answered: "Inappropriate things." Asked if such inappropriate things included going beyond the cones that were on the playground, plaintiff answered: "Well, there was [sic] no cones at the play yard. You just play wherever."

In her declaration, plaintiff stated she participated in the ASPP on the days that Mother did not pick her up at the close of the school day at 2:30 p.m. Alice asked plaintiff if she wanted to be part of a club but did not tell her what kind of club. Later plaintiff learned it was the kissing club. Had plaintiff known what types of activities the children in the kissing club engaged in, she would not have wanted to be part of the club. The other members of the kissing club took her to an area behind some classrooms at the edge of the playground where there was an unlocked shed that the members of the kissing club called the "cabin." While at the cabin, Alice told Bobby to kiss plaintiff. Bobby kissed plaintiff even though she did not want him to and she felt his tongue in her mouth and on her cheek. After that occurred, she was upset and stayed by herself on the playground until Mother picked her up.

Plaintiff did not tell anyone about the kiss because she was embarrassed and afraid of the other children. Two days later she was playing handball in

the ASPP when Alice approached her and told her she had to go to the cabin. Plaintiff did not want to go but went anyway because she was afraid of Alice. The other members of the kissing club (Bobby and the other boy) were already there. Alice told plaintiff to go into the cabin and then told her and Bobby to have sex. Plaintiff responded she did not want to. But Alice told her and Bobby to pull down their pants. When plaintiff refused to pull down her pants Alice hit her repeatedly until she did as she was told just to keep from being hit anymore. Then plaintiff was forced to her knees and Bobby came behind her and put his privates on and in her butt. When plaintiff was able, she pulled up her pants and ran out of the cabin to the playground and stayed away from the kissing club children until she was picked up from school.

### 4. Ruling on Summary Judgment Motion

In deciding defendants' summary judgment/adjudication motion, the trial court ruled that generally schools do not owe a duty of care to children who are participating in voluntary after-school programs. Moreover, said the court, the school district had no special relationship with plaintiff, Alice or Bobby that imposed a special duty of care on the school district to protect plaintiff from them, because there was no evidence showing defendants were aware that Alice or Bobby had sexual proclivities towards plaintiff or other students.

## DISCUSSION

The facts of this case raise questions of law, including whether plaintiff was owed a duty of care by defendants in their operation of the ASPP, and if such a duty was owed, whether we can say as a matter of law, based on the evidence presented to the trial court, that the supervision of the ASPP was adequate and did not fall below the standard of care imposed by that duty or, if it did fall below the standard of care, whether defendants' actions were nevertheless not the proximate cause of plaintiff's injuries.

### 1. Standard of Review

We review the order granting defendants' motion for summary judgment/adjudication on a de novo basis. (*Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 474 [261 Cal.Rptr. 735].) In doing so, we apply the same rules the trial court was required to apply in deciding the motion.

When the defendant is the moving party, it has the burden of demonstrating as a matter of law, with respect to each of the plaintiff's causes of action that is addressed in the motion, that one or more elements of the cause of action

cannot be established, or that there is a complete defense to the cause of action. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) If a defendant's presentation in its moving papers will support a finding in its favor on one or more elements of the cause of action or on a defense, the burden shifts to the plaintiff to present evidence showing that, contrary to the defendant's presentation, a triable issue of material fact actually exists as to those elements or the defense. That is, the plaintiff must present evidence that has the effect of disputing the evidence proffered by the defendant on some material fact. (*Ibid.*) Thus, section 437c, subdivision (c), states that summary judgment is properly granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Because a summary judgment denies the adversary party a trial, it should be granted with caution. (*Michael J. v. Los Angeles County Dept. of Adoptions* (1988) 201 Cal.App.3d 859, 865 [247 Cal.Rptr. 504].) Declarations of the moving party are strictly construed, those of the opposing party are liberally construed, and doubts as to whether a summary judgment should be granted must be resolved in favor of the opposing party. The court focuses on issue finding; it does not resolve issues of fact. The court seeks to find contradictions in the evidence, or inferences reasonably deducible from the evidence, which raise a triable issue of material fact. (*Id.* at pp. 865–866.) If, in deciding this appeal, we find there is no issue of material fact, we affirm the summary judgment if it is correct on any legal ground applicable to this case, whether that ground was the legal theory adopted by the trial court or not, and whether it was raised by defendant in the trial court, or first addressed on appeal. (*Western Mutual Ins. Co. v. Yamamoto* (1994) 29 Cal.App.4th 1474, 1481 [35 Cal.Rptr.2d 698].) If, on the other hand, we find that one or more triable issues of material fact exist, we must reverse the summary judgment.

## 2. *Relevant Case Law*

### a. *Overview*

The law regarding the duty of supervision on school premises is very, very well established. "It is the duty of the school authorities to supervise at all times the conduct of the children on the school grounds and to enforce those rules and regulations necessary to their protection. [Citations.] The school district is liable for injuries which result from a failure of its officers and employees to use ordinary care in this respect. [Citations.]" (*Taylor v. Oakland Scavenger Co.* (1941) 17 Cal.2d 594, 600 [110 P.2d 1044] (*Taylor*).)

"What is ordinary care depends upon the circumstances of each particular case and is to be determined as a fact with reference to the situation and knowledge of the parties." (*Bellman v. San Francisco H. S. Dist.* (1938) 11 Cal.2d 576, 582 [81 P.2d 894].)

In *Hoyem v. Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508 [150 Cal.Rptr. 1, 585 P.2d 851] (*Hoyem*), a 10-year-old boy who was enrolled in summer school left the school campus prior to the end of the summer school day and was struck and injured by a motorcycle at a public intersection. He sued the school district alleging the accident and his injuries were proximately caused by school authorities' negligent supervision of students. Finding that the defendant school district incurred no liability as a matter of law, the trial court sustained the school district's demurrer, dismissed the suit, and entered judgment in the defendant's favor. The Supreme Court reversed and held that if the truant student could prove that his injuries were proximately caused by the school district's alleged negligent supervision, the district could be held liable for the damages resulting from the child's injuries, with liability diminished on the basis of comparative negligence principles to the extent the trier of fact would find that the student's own negligence was a proximate cause of his injuries. (*Id.* at pp. 512, 519, fn. 4.) The liability of the motorcycle driver was not at issue in the appeal, as it was addressed in a separate suit filed by the student, but the *Hoyem* court observed that the school district could join the driver, as a cross-defendant in the plaintiff's suit against the district, to pursue a comparative indemnity claim. (*Id.* at pp. 512, fn. 1, 521.)

The *Hoyem* court stated the school district had a "firmly established duty to exercise due care in supervising [the plaintiff] *while he was on school premises*." (*Hoyem, supra,* 22 Cal.3d at p. 515.) The court rejected the district's argument that if a school district may be liable for injuries to a truant, it would require school districts to construct "truant-proof" schools. The court said that a school district's duty only requires "ordinary care" such that schools are "reasonably supervised." (*Id.* at p. 519.) Regarding that requirement of ordinary care, the court stated: "Although a school district is not an insurer of its pupils' safety [citation], our cases have long established that a school district bears a legal duty to exercise reasonable care in supervising students in its charge and may be held liable for injuries proximately caused by the failure to exercise such care. [Citations.] [¶] We recently reaffirmed this rule in *Dailey* v. *Los Angeles Unified Sch. Dist.* (1970) 2 Cal.3d 741, 747 [87 Cal.Rptr. 376, 470 P.2d 360], declaring that 'California law has long imposed on school authorities a duty to "supervise at all times the conduct of the children on school grounds and to enforce those rules and regulations necessary to their protection." [Citations.] The standard of care

imposed upon school personnel in carrying out this duty to supervise is identical to that required in the performance of their other duties. This uniform standard to which they are held is that degree of care "which a person of ordinary prudence, charged with [comparable] duties, would exercise under the same circumstances." [Citations.]' [¶] In *Dailey*, two unsupervised high school students engaged in 'slap-boxing' in the school gym during lunch hour, and as a result, one of the students fell, struck his head, and died shortly thereafter. 'Slap-boxing' is a rough and forbidden game which, according to the testimony of other students, was never played when a teacher was nearby. In reversing a directed verdict in favor of defendant school district, this court held that the issues of whether or not the school acted negligently in failing to provide adequate supervision of the lunch hour recess and, if so, whether the student's injuries were proximately caused by such negligence, fell within the province of the jury." (*Hoyem, supra*, 22 Cal.3d at p. 513, italics added.)[8,9]

### b. *Special Relationship Between Schools and Students*

■ The duty of care imposed on a school district towards its pupils arises from their special relationship. In *M. W. v. Panama Buena Vista Union School Dist.* (2003) 110 Cal.App.4th 508, 517 [1 Cal.Rptr.3d 673] (*M.W.*), the court observed that although generally a defendant owes no duty to control the

---

[8] In referencing its statement in *Dailey v. Los Angeles Unified Sch. Dist., supra*, 2 Cal.3d at p. 747 (*Dailey*), that school authorities must enforce rules and regulations necessary for the protection of students, the *Hoyem* court observed that title 5, section 303 of the California Administrative Code (now the California Code of Regulations) places limits on when a student may leave school premises prior to the regular time for school closing. The court stated it had no doubt that the purpose of section 303 "is at least in part for the pupils' protection, and that the school authorities therefore bore the duty to exercise ordinary care to enforce the rule." (*Hoyem, supra*, 22 Cal.3d at p. 514.)

In the instant case, as noted in footnote 4, *ante*, California Code of Regulations, title 5, section 5552 directs that playground supervision must be provided for "the conduct and safety, and for the direction of the play, of the pupils of the school who are on the school grounds during recess and other intermissions and before and after school." There can be no doubt that at least one purpose of this regulation is protection of students. Another could be to minimize school district liability for injuries to students.

[9] Although the trial court in this case acknowledged the *Hoyem* and *Dailey* decisions, the court nevertheless granted defendants' summary judgment motion because it concluded that generally a school district does not owe a duty of care to children participating in voluntary after-school programs. The court cited *Bartell v. Palos Verdes Peninsula Sch. Dist.* (1978) 83 Cal.App.3d 492 [147 Cal.Rptr. 898]. According to the operative complaint in *Bartell*, that case involved two children who came onto a school playground through a hole in a fence or an unlocked gate after school hours. They were there to use their skateboards and while playing a skateboard version of crack the whip, one of them fell and suffered fatal injuries. The *Bartell* court held that the duty of supervision imposed on school districts "is limited to school-related or encouraged functions and to activities taking place during school hours." (*Id.* at p. 499.) Here, of course, the ASPP was an encouraged after-school program, it had school-district-imposed hours of operation, and it was advertised to parents as being a supervised program.

conduct of another person or warn those endangered by that conduct, nevertheless a duty to do so may arise if there is a special relationship between the defendant and the person whose conduct needs to be controlled which imposes a duty on the defendant to control the other's conduct, or there is a special relationship between the defendant and a third person that gives the third person a right to protection.

The *M.W.* court stated that "[a] special relationship is formed between a school district and its students resulting in the imposition of an affirmative duty on the school district to take all reasonable steps to protect its students [and t]his affirmative duty arises, *in part*, based on the compulsory nature of education. [Citations.]" (*M.W., supra,* 110 Cal.App.4th at p. 517, italics added.) In the instant case, the trial court focused on the fact that the incidents in the playground shed occurred *after* compulsory school hours, in a voluntary program. However, the compulsory nature of education is not the only factor to consider in determining whether a duty of care existed when a child is injured on school grounds. In *Leger v. Stockton Unified School Dist.* (1988) 202 Cal.App.3d 1448 [249 Cal.Rptr. 688] (*Leger*), a student was injured not while he was attending mandatory education classes but rather when he was attacked in a restroom at his high school while changing his clothes before wrestling practice. The reviewing court held the plaintiff had sufficiently pled that the defendant school district and its employees (the principal of the school and its wrestling coach) breached a duty of care they owed to him. Thus, while it may be compulsory education that brings children to school, children engage in noncompulsory activities while there, both before and after the regular school day.

 Moreover, not all students attend education classes that are mandatory. The *Hoyem* court noted that parents place trust in schools to supervise their children and "[a] large number of working parents enroll their children in summer school because they cannot afford alternative adult supervision. Surely these parents may legitimately expect adequate supervision." (*Hoyem, supra,* 22 Cal.3d at p. 519.) As noted above, the ASPP is a program arranged by the school district with suggestions to schools that parents be advised that the ASPP is a supervised program; and Mother stated in her declaration that she had the understanding that the program would be adequately supervised. Like parents who utilize summer school for its adult supervision, there is evidence in this case showing that Mother utilized the ASPP for its adult supervision on the days when she or her husband were not able to pick plaintiff up immediately after school ended for the day. Thus, although plaintiff was not engaged in compulsory education at the time of the incidents in the playground shed, there was a special relationship between the school

district and its students who engaged in the after-school program, giving plaintiff a right to reasonable protection.

■ "Either a total lack of supervision [citation] or ineffective supervision [citation] may constitute a lack of ordinary care on the part of those responsible for student supervision. Under section 815.2, subdivision (a) of the Government Code, a school district is vicariously liable for injuries proximately caused by such negligence." (*Dailey, supra,* 2 Cal.3d at p. 747, fn. omitted; accord, *Leger, supra,* 202 Cal.App.3d at pp. 1460–1462, addressing vicarious liability for a public school district under Gov. Code, §§ 815.2 & 820 of the Cal. Tort Claims Act.)

In *Forgnone v. Salvador U. E. School Dist.* (1940) 41 Cal.App.2d 423, 426 [106 P.2d 932] (*Forgnone*), the court observed that "the mere lack of supervision, or inadequate supervision may not necessarily create liability on the part of a school district to compensate for injuries sustained by a pupil. If it appears that a supervisor could not have reasonably anticipated or prevented the conduct of fellow students which resulted in injuries, it might not be material whether they were present at the time of the act complained of, or not. But when the omission to perform a duty, like that of being present to supervise the conduct of pupils during an intermission while they are eating their lunches in a school room, may reasonably be expected to result in rough and dangerous practices of wrestling and scuffling among the students, the wrongful absence of a supervisor may constitute negligence creating a liability on the part of the school district. The question as to whether the absence of the supervisor from her post of duty in the present case contributed to the cause of the injury received by [the minor plaintiff], will depend upon the particular circumstances to be established at the trial. It is the province of the trial judge or the jury to determine whether the facts may show that her absence actually did contribute to the injury received. The complaint alleges that while the children were eating their luncheons in the class-room a fellow student engaged in scuffling with [the plaintiff] during which encounter her arm was twisted and broken."[10]

---

[10] In *Dailey*, the court noted that "[i]t is the uniform rule that the determination of whether the supervision is adequate, that is, whether it amounts to due care, is a question of fact for the jury. [Citations.]" (*Dailey, supra,* 2 Cal.3d at pp. 749–750, fn. 6.) The court summarized the facts (or alleged facts) in seven cases in which there was sufficient evidence of either no supervision or inadequate supervision at the time the student plaintiffs' injuries occurred to submit the issue of the defendant school districts' liability to a jury, to support a jury's verdict of liability, or to overrule a demurrer to a complaint. (*Id.* at p. 749, fn. 5.)

In *Thompson v. Sacramento City Unified School Dist.* (2003) 107 Cal.App.4th 1352, 1371–1372 [132 Cal.Rptr.2d 748], the court stated that imposing on a student suing a school district on a negligence cause of action the requirement that the student "prove the traditional elements of actionable negligence, including causation," "does not impose an impossible burden on an injured student; the requirement merely precludes recovery where it cannot

■ In *Hoyem*, the court rejected the school district's assertion that the conduct of the motorcycle driver who hit the truant plaintiff student was a superseding cause cutting off any liability the district might have for the accident. (*Hoyem, supra*, 22 Cal.3d at p. 521.) It noted that in *Dailey* the court had rejected a defendant school district's argument that it was not the district's negligent supervision of students but rather a third party's wrongfully hitting the deceased student while slap boxing that was the proximate cause of the student's death. In that regard, the *Dailey* court stated: "The fact that another student's misconduct was the immediate precipitating cause of the injury does not compel a conclusion that negligent supervision was not the proximate cause of [the student's] death. Neither the mere involvement of a third party nor that party's wrongful conduct is sufficient in itself to absolve the defendants of liability, once a negligent failure to provide adequate supervision is shown. [Citations.]" (*Dailey, supra*, 2 Cal.3d at p. 750, fn. omitted.)

### c. *The Immaturity of Children As a Factor in Duty of Care*

■ California cases have cited the immaturity of children as a factor in the issue of a school district's duty of care to students. In *Forgnone, supra*, 41 Cal.App.2d 423, the court took up the case of a student who had her arm broken in a scuffle with another student during an unsupervised lunch period. Citing former School Code section 5.543 which, like the abovementioned Education Code section 44807, required teachers to hold students accountable for their behavior on the way to and from school, on the playground and during recess, and noting that the complaint in the case alleged a state Board of Education rule which, like section 5552 of title 5 of the California Code of Regulations, required that teachers should supervise students who are on school grounds during intermissions and before and after school if special playground supervision was not otherwise provided, the *Forgnone* court stated that the purpose of the law requiring supervision of students "is to regulate their conduct so as to prevent disorderly and dangerous practices which are likely to result in physical injury to *immature scholars* under their custody." (*Id.* at pp. 425–426, italics added.)

Noting that proximate cause is generally a question for the trier of fact, the *Hoyem* court rejected the defendant school district's assertion that assuming arguendo there was negligent supervision on the part of the district, the court

---

properly be said that an injury has been caused by negligent supervision. For example, where a school fails to provide supervision and an injury results from conduct that would not have occurred had supervision been provided, liability may be imposed. [Citations.] Where supervision is provided but the supervisor allows dangerous conduct to go on, liability may be imposed. [Citations.]"

should hold as a matter of law that such negligence was not the proximate cause of the plaintiff student's injuries from a motorcycle accident occurring off campus. The court began its analysis of proximate cause by rejecting the district's contention "that it should not be expected to foresee that students will take advantage of a lapse in supervision to leave the school premises, and therefore that any off-campus injury is unforeseeable as a matter of law." (*Hoyem, supra*, 22 Cal.3d at p. 520.) The court stated that "the duty to supervise school children is imposed in large part *in recognition of the fact that, without such supervision, students will not always conduct themselves in accordance with school rules or as safely as they ought to*. [Citations.]" (*Ibid.*, italics added.)

In *Dailey*, the court stated that a conclusion that negligent supervision was the proximate cause of a student's death was not precluded by the fact that the decedent sustained his injury while engaging in "boisterous behavior" by slap-boxing, nor by "[t]he fact that another student's misconduct was the immediate precipitating cause of the injury." (*Dailey, supra*, 2 Cal.3d at pp. 748, 750.) The court observed that "[s]upervision during recess and lunch periods is required, in part, so that discipline may be maintained and student conduct regulated. Such regulation is necessary precisely because of the *commonly known tendency of students to engage in aggressive and impulsive behavior which exposes them and their peers to the risk of serious physical harm*. High school students may appear to be generally less hyperactive and more capable of self-control *than grammar school children*. Consequently, less rigorous and intrusive methods of supervision may be required. Nevertheless, adolescent high school students are not adults and should not be expected to exhibit that degree of discretion, judgment, and concern for the safety of themselves and others which we associate with full maturity. . . . Recognizing that a principal task of supervisors is to anticipate and curb *rash student behavior*, our courts have often held that a failure to prevent injuries caused by the intentional or reckless conduct of the victim or a fellow student may constitute negligence. [Citations.]" (*Id.* at pp. 748–749, italics added, fns. omitted.)

In the instant case there is evidence defendant playground supervisor told ASPP students to stay within a certain area of the playground. However, given the nature of children, especially young children, to act impulsively and disregard directives regarding their own safety, spoken boundaries may be disregarded by them, including boundaries beyond which lay a hidden area accessible by these young children, and a hidden unlocked shed. Young children may use such hidden places to act in ways they would not act if they remained in the plain view areas of the playground. Other problems may also arise. A child may be injured in a hidden area and not receive aid for some

time because his injury is not seen by others, or he may be victimized by an outsider in that hidden area. Moreover, there is evidence in this case that there was only one playground supervisor on duty to supervise the 113 children attending the ASPP on the day plaintiff was sexually assaulted. Quoting from a California Court of Appeal case, the *Hoyem* court observed that the amount of care required of school personnel in supervising students is " '*commensurate with the immaturity of their charges and the importance of their trust.*' " (*Hoyem, supra,* 22 Cal.3d at p. 520, italics added.) In the instant case, the first and second grade students involved in the incidents in the school yard shed were, because of their age, among the least mature of the children on the playground.

 d. *Foreseeability, Prior Similar Incidents, and Assumption of Risk Issues*

■ "It is not necessary to prove that the very injury which occurred must have been foreseeable by the school authorities in order to establish that their failure to provide additional safeguards constituted negligence. Their negligence is established if a reasonably prudent person would foresee that injuries of the same general type would be likely to happen in the absence of such safeguards." (*Taylor, supra,* 17 Cal.2d at p. 600; accord, *Charonnat v. S. F. Unified Sch. Dist.* (1943) 56 Cal.App.2d 840, 844 [133 P.2d 643].) It is for the trier of fact to determine whether an unreasonable risk of harm was foreseeable under the facts of a case. (*M.W., supra,* 110 Cal.App.4th at p. 516.) "Foreseeability is determined in light of all the circumstances and does not require prior identical events or injuries. [Citations.]" (*Id.* at p. 519.)[11]

---

[11] In that respect, the concurring opinion in *M.W.* observed that cases which address premises liability for third party criminal acts and require that there be prior similar incidents to show foreseeability of such third party criminal acts, such as *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666 [25 Cal.Rptr.2d 137, 863 P.2d 207] and *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181 [91 Cal.Rptr.2d 35, 989 P.2d 121], disapproved on another point in *Aguilar, supra,* 25 Cal.4th at page 853, footnote 19, are not applicable to school injury cases involving the special relationship existing between a school district and its students and the duty of supervision that comes from that special relationship. (*M.W., supra,* 110 Cal.App.4th at p. 525.) So also we observe that cases such as *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763 [107 Cal.Rptr.2d 617, 23 P.3d 1143] and *Nola M. v. University of Southern California* (1993) 16 Cal.App.4th 421 [20 Cal.Rptr.2d 97], which focus on causation rather than prior similar events but which also concern premises liability for third party criminal acts, are also inapplicable to such school injury cases.

Likewise, because *M.W.* involved the special relationship between school districts and students and the duty of care of supervision imposed by that relationship, the *M.W.* court rejected the defendant school district's contention that under *Chaney v. Superior Court* (1995) 39 Cal.App.4th 152 [46 Cal.Rptr.2d 73] and *Romero v. Superior Court* (2001) 89 Cal.App.4th 1068 [107 Cal.Rptr.2d 801], liability should not be imposed on the school district because it had no *actual knowledge* that a student who sexually attacked the plaintiff had a propensity to

In *Charonnat v. S. F. Unified Sch. Dist., supra,* 56 Cal.App.2d 840, the plaintiff was injured during recess when another student intentionally twisted the plaintiff's leg so hard it broke. The school yard, an area of about 180 feet by 120 feet, was being supervised by only the assistant principal and there were approximately 100 to 150 students on it when the incident occurred. Plaintiff was 11 years old at the time he was injured. Prior to the day of the injury there had been quarrels and fights on the school yard. The reviewing court held that whether the defendant provided sufficient supervision on the day of the incident and whether the supervisor was negligent in her duties were questions of fact (*id.* at pp. 843–844), and it was not "necessary that the very injury which occurred must have been foreseeable by the school authorities or the yard supervisor in order to establish that their failure to provide adequate protection constituted negligence" (*id.* at p. 844).

In *Lucas v. Fresno Unified School Dist.* (1993) 14 Cal.App.4th 866 [18 Cal.Rptr.2d 79], a 10-year-old student was injured at recess when he and other students engaged in throwing dirt clods at each other and he was hit in the eye. The reviewing court held that given the duty imposed on schools by Education Code section 44807, California Code of Regulations, title 5, section 5552, and California case law to supervise children on school grounds, the defendant school district had a duty to supervise the injured plaintiff and the other students on the playground during recess "to prevent precisely what occurred in the case," and the fact that the minor plaintiff knew he was not supposed to engage in dirt clod throwing would not prevent his recovery of damages from the school district under an implied assumption of risk defense. (14 Cal.App.4th at pp. 871–873.)

---

commit sexual assaults. *Chaney* and *Romero* involved the issue of homeowner liability for sexual assault on a minor taking place in the homeowner's residence after the minor was invited there. Although the *Chaney* and *Romero* courts recognized that "[t]he courts in this state have held that an adult who invites a minor into his or her home assumes a special relationship with that youngster based on the minor's vulnerability to third party misconduct and dependence on the adult for protection from risks of harm while in the home" (*Romero, supra,* 89 Cal.App.4th at pp. 1080–1081, citing *Chaney, supra,* 39 Cal.App.4th at p. 157), *Chaney* and *Romero* held that liability would not be imposed on the defendant homeowners absent evidence that the sexual attacks on the minor plaintiffs were reasonably foreseeable, and that would require actual knowledge, on the part of the homeowners, of the assailants' propensity to sexual attacks. Absent such actual knowledge, no duty of care would arise to take reasonable measures to protect the minors from the sexual assaults. (*Chaney,* at pp. 156–158; *Romero,* at pp. 1080–1084; accord, *Margaret W. v. Kelley R.* (2006) 139 Cal.App.4th 141 [42 Cal.Rptr.3d 519], and *J.L. v. Children's Institute, Inc.* (2009) 177 Cal.App.4th 388 [99 Cal.Rptr.3d 5].) The *M.W.* court declined to extend *Chaney* and *Romero* to school cases, saying that schools operate under public policies and statutes that are not applicable to private homeowners. (*M.W., supra,* 110 Cal.App.4th at pp. 524–525.)

Nor is the particular plaintiff or particular type of plaintiff necessarily the focus of negligence analysis. In *Jennifer C. v. Los Angeles Unified School Dist.* (2008) 168 Cal.App.4th 1320 [86 Cal.Rptr.3d 274], a special needs 14-year-old student was sexually assaulted by another special needs student in an alcove under a stairway on the school's border. The alcove was not visible from the school campus but was visible to anyone walking alongside the stairway on the adjoining sidewalk. A summary judgment entered in favor of the defendant school district was reversed by the reviewing court. In analyzing the issue of the school district's duty to the plaintiff the court observed, among other things, that the burden to the defendant and consequence to the community of imposing a duty of care on the defendant and resulting liability for breach of that duty are acceptable because the goal is to have school grounds that are safe not only for special needs children but for *all* children. (*Id.* at pp. 1329–1330.)

## *CONCLUSION*

■ Under California law, defendants have a duty to use ordinary care in supervising the ASPP. What constitutes ordinary care is a matter for the trier of fact with reference to the facts of the case. Plaintiff presented evidence that she sustained injuries in the playground shed, and defendants may be held liable for such injuries if plaintiff can prove that they were proximately caused by defendants' alleged negligent supervision and were a foreseeable, unreasonable risk of harm. Whether defendants were negligent in their supervision of the ASPP, whether such negligence was a proximate cause of plaintiff's injuries, and whether those injuries were an unreasonable risk of harm that was foreseeable by defendants are also questions for the trier of fact.

Plaintiff need not show that the very type of injury she sustained was foreseeable in the absence of adequate supervision. Thus, although one might argue that the instant case raises the question whether it is foreseeable that first and second grade students would sexually assault plaintiff, the question is accurately framed as whether it is foreseeable that one child may be assaulted by another child during the ASPP in the absence of adequate protective safeguards, as plaintiff asserts occurred in this case. Although a sexual assault on a young student by a child of similar age is shocking, nevertheless playground supervisors are required to be on the lookout for the safety of their charges, including assaults on children, not just for specific forms of assault. Unlocked sheds and the back sides of classroom bungalows provide cover for assaults of any nature and moreover, there is evidence that the harm to plaintiff included nonsexual physical assault.

## *DISPOSITION*

The summary judgment is reversed and the cause is remanded for further proceedings consistent with the views expressed herein. Costs on appeal to plaintiff.

Klein, P. J., and Aldrich, J., concurred.

A petition for a rehearing was denied April 14, 2010, and respondents' petition for review by the Supreme Court was denied June 23, 2010, S182409.